GENERAL INSURANCE COMPANY OF AMERICA, Safeco Insurance Company of America, Washington corporations; and Mountain States Investment Builders; Gene A. Becker, Individually and as a partner in and d/b/a Mountain States Investment Builders, a partnership; Dick N. Richards, Individually and as a partner in and d/b/a Mountain States Investment Builders, a partnership; and Clyde Skeen, Individually and as a partner in and d/b/a Mountain States Investment Builders; John Does, one through five inclusive, Individually and as a partner in and d/b/a Mountain States Investment Builders, Petitioners,

v.

CITY OF COLORADO SPRINGS, A municipal corporation, State of Colorado, Respondent.

No. 80SC139.

Supreme Court of Colorado, En Banc.

Dec. 21, 1981.

Rehearing Denied Jan. 11, 1982.

---

Cross, Gaddis, Kin & Quicksall, Larry R. Gaddis, Colorado Springs, for all petitioners.

Grant, McHendrie, Haines & Crouse, P. C., Peter J. Crouse, Phyllis Cox, Denver, for petitioners Safeco Insurance Co. and General Insurance Co. of America.

Rector, Retherford, Mullen & Johnson, Jerry A. Retherford, Neil C. Bruce, Colorado Springs, for respondent.

QUINN, Justice.

We granted certiorari to review the decision of the Court of Appeals in *City of Colorado Springs v. General Insurance Co.*, Colo.App., 616 P.2d 147 (1980), which reversed a summary judgment entered in favor of corporate sureties and individual defendants on a surety bond issued pursuant to a municipal ordinance in order to secure a municipal corporation against a subdivision developer's noncompletion of certain street improvements. The Court of Appeals, construing the bond to be a penalty bond, held that nonperformance by the subdivision developer entitled the city to recover the full amount of the bond irrespective of any proof of damage and directed the district court to enter summary judgment for the city. We reverse the judgment of the Court of Appeals and remand with directions.

## I.

In June 1972 Mountain States Investment Builders (MSIB) applied for and received from the City of Colorado Springs (city) approval of the final plat of the Central Colorado Bank subdivision. The subdivision was to be developed for high-rise residential use. MSIB also had requested of the city council a waiver of the city zoning ordinance which restricted office use in high-rise buildings to 10% of the floor space, and a conditional use so as to permit the construction of a high-rise commercial office building in the subdivision.[1] The city council denied the request and its decision was appealed. Ultimately, the appeal was dismissed pursuant to stipulation of the city and the owner of the subdivision.

Before the appeal had been dismissed, MSIB, in January 1973, filed with the city council a plat extending two streets, Barnes Avenue and Printers Road, beyond the Central Colorado Bank subdivision.[2] The street extension plat depicted the land adjacent to the streets as unplatted and undeveloped. At the time the plat was filed with the city council, section 13–19(B)(4)(a) of the city's Subdivision Ordinance required that a letter of credit and/or a cash or performance bond accompany the final plat in order to "secure to the City the actual construction and installation of all required street improvements if the improvements are not installed; and park and land fees; and drainage basin fees; and recordation fees . . . ." Section 13–22(a) of the Subdivision Ordinance also provided:

"The improvements required below shall be constructed and installed by the subdivider or provisions made therefor, prior to the final approval of the subdivision and the final plat thereof. In lieu of the completion of such improvements, the subdivider may provide a letter of credit to secure to the City the actual construction of the improvements within such period as shall be determined by the Director of Public Works or the Director of Public Utilities. Said letter of credit shall be in an amount adequate to cover the cost of the improvements as determined by the Director of Public Works or the Director of Public Utilities. . . ."

\* \* \* \* \* \*

"In order to provide for the orderly construction of public improvements as areas are built and developed, to avoid intermittent sections so improved or unimproved and to promote the public health, safety and welfare, all streets shall be graded and improved by paving work, gutter and sidewalks, unless provided that the City Council shall find upon the recommendation of the Planning Commission and City Manager, that paving, curb and gutter and sidewalks, or any of them, are not required for an adequate use and development of the area involved . . . ."

Pursuant to these provisions MSIB as principal and Safeco Insurance Company of America (Safeco) as surety executed on March 6, 1973, a surety bond which provided, in pertinent part, as follows:

1. The circumstances underlying the filing of the 1972 plat date back some time. In the 1960's Gene Becker, who is the principal partner in MSIB, and his other partners were designated by Union Printers Home, owner of the undeveloped tract, to develop the tract on a parcel-by-parcel basis. The development plan contemplated that Becker would enter into a long-term lease with Union regarding a specific parcel, Becker would plat the land with the city, would develop it for specified commercial purposes, and then would sublease it. Several parcels were developed in this manner. In 1972 MSIB arrived at an agreement with Union Printers Home to plat and develop an eight-acre parcel of land south of a motel and restaurant previously developed under the plan. The eight-acre tract, known as the Central Colorado Bank subdivision, was to be used for the high-rise residential units. MSIB claims there was a pre-existing agreement with the city to permit the parcel to be developed with a high-rise office building for Central Colorado Bank. It was on the basis of this alleged pre-existing agreement that MSIB's application was made to the city council for the construction of the office building in the residential subdivision.

2. According to MSIB, the street extension plat was filed to enhance the development of the Central Colorado Bank subdivision and to demonstrate MSIB's readiness and willingness to proceed with the office building as an integral part of the subdivision development.

"WHEREAS, the above bounden MOUNTAIN STATES INVESTMENT BUILDERS has filed or is about to file with the CITY OF COLORADO SPRINGS, a plat at Barnes Avenue and Printers Road, Colorado Springs, Colorado, which requires that within twenty-four (24) months, said principal will complete paving streets, sidewalks, curbs, gutters, and storm drains in accordance with the requirements of the City of Colorado Springs pertaining thereto.

"WHEREAS, on the 7th day of March, 1973, the Principal entered into an agreement referred to as Surety Agreement, with the Obligee. This agreement is by reference made a part hereof.[3]

"NOW THEREFORE, the condition of this obligation is such that if the above bounden Principal, shall faithfully perform and complete said paving streets, sidewalks, curbs, gutters, and storm drains, then this obligation shall be void; otherwise, to remain in full force and effect."

The city council approved the plat for the street extensions and on March 23, 1973, the plat was filed of record with the County Clerk and Recorder.

MSIB initially spent about $50,000 for rough grading and engineering work on the street improvements. However, in 1974 the relationship between MSIB and the owner of the subdivision, Union Printers Home, foundered and MSIB failed to complete the improvements. In September 1974 MSIB filed reorganization proceedings in bankruptcy and thereafter sought vacation of both the Central Colorado Bank subdivision and the street extensions. The city council denied the application to vacate. Upon the expiration of the two year period for completing the street improvements, the city commenced an action on the bond against MSIB, several individual partners of MSIB, Safeco and General Insurance Company (defendants).[4] The defendants denied liability on the bond, claiming that the city suffered no damage by the noncompletion of the street improvements and asserted various affirmative defenses including impossibility of performance, estoppel, and mutual mistake.

The city filed a motion for summary judgment on the ground that the bond was either a penalty bond or a contract for liquidated damages. The district court denied the city's motion for summary judgment but entered summary judgment for the defendants, none of whom had moved for such relief. The court concluded that the bond was an indemnity bond and since the subdivision development had been abandoned by MSIB and there was no need for the street improvements, the city sustained no damage and therefore could not recover. The Court of Appeals, construing the bond as a penalty bond, reversed the judgment and remanded with directions to enter summary judgment in favor of the city.[5] We conclude that the bond in question is an indemnification bond and unresolved issues of fact render summary judgment inappropriate under the present state of the record.

---

3. No surety agreement of March 7, 1973, appears in the record and in its answer to interrogatories the city stated that it was not aware of any such agreement.

4. The interest of General Insurance Company in this case is not apparent from either the complaint or the record. Safeco is the only insurance company which signed the bond.

5. The Court of Appeals, relying on its opinion in *Board of County Commissioners v. Colorado National Bank*, Colo.App., 607 P.2d 1010 (1979), analogized the surety contract to a letter of credit and stated: "[W]e do not see that a different rule should be adopted merely because the subdivider decides to meet the city ordinance requirement by filing an insurance

company bond instead of obtaining a letter of credit." This analogy, however, is not well taken. As illustrated by *Colorado National Bank v. Board of County Commissioners*, Colo., 634 P.2d 32 (1981), where we affirmed in part and reversed in part the decision of the Court of Appeals, a letter of credit creates a liability for the issuer, usually a bank, separate and apart from the underlying contract between the issuer's customer and the beneficiary of the letter of credit. The issuer's liability is founded on Article 5 of the Uniform Commercial Code, section 4–5–101 *et seq.*, C.R.S. 1973. In the case of a surety agreement, however, the rights and liabilities of the parties are based on the law of contract and suretyship.

## II.

The defendants argue that the Court of Appeals incorrectly construed the bond as a penalty bond, rather than an indemnity bond, and therefore erred in ordering summary judgment for the full amount of the bond without proof of damage to the city. We agree with the defendants' argument. Although the character of the bond in question is not determinable from its own terms, it is quite clear that, when considered in light of the ordinance pursuant to which it was issued, the bond contemplates indemnification to the city to cover the cost of the uncompleted work up to the amount of the bond.

■■■ A surety bond is a written contract guaranteeing performance of an obligation by another and is to be interpreted according to the standards which govern the construction of contracts in general. E.g., Covey v. Schiesswohl, 50 Colo. 68, 114 P. 292 (1911); Bonney v. Robertson, 6 Colo. App. 485, 41 P. 842 (1895); Restatement of Security, § 88 (1941). The significance of construing the contractual obligation as either a penalty bond or an indemnity bond is critical to the obligee's right to recover against the principal and surety without proof of damage. If the surety agreement is construed as a penalty bond, the city may recover the full amount of the bond upon nonperformance by MSIB irrespective of damage. E.g., Clark v. Barnard, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883). On the other hand, a construction of the surety agreement as an indemnity bond will limit the city's right of recovery to the cost of completion of the improvements, not to exceed the face amount of the bond. E.g., United States v. Zerbey, 271 U.S. 332, 46 S.Ct. 532, 70 L.Ed. 973 (1926), Morro Palisade Co. v. Hartford Accident & Indemnity Co., 52 Cal.2d 397, 340 P.2d 628 (1959); County of Los Angeles v. Margulis, 6 Cal. App.2d 57, 44 P.2d 608 (1935); Town of Stoneham v. Savelo, 341 Mass. 456, 170 N.E.2d 417 (1960). A court must interpret the language of the bond in accordance with the intent of the parties, which generally is to be determined from the language of the instrument itself. Radiology Professional Corporation v. Trinidad Health Association, 195 Colo. 253, 577 P.2d 748 (1978). However, where the meaning of an instrument is uncertain, extrinsic evidence may be utilized to determine contractual intent. E.g., Radiology Professional Corporation v. Trinidad Health Association, supra; Harmon v. Waugh, 160 Colo. 88, 414 P.2d 119 (1966).

■■■ Although the bond in this case clearly imposes upon MSIB, as principal, and Safeco, as surety, a contractual obligation up to a sum certain conditioned upon nonperformance by MSIB, the bond does not expressly state whether the obligation is one of penalty or indemnification. Under these circumstances it is appropriate to look to the legislation pursuant to which the bond was issued in order to determine the nature of the contractual obligation. E.g., O'Kane v. Lederer, 4 F.2d 418 (E.D.Pa. 1923); United States Fidelity and Guarantee Company v. Bross, 118 Ariz. 599, 578 P.2d 1028 (1978); Morro Palisades Company v. Hartford Accident and Indemnity Company, supra. The determination of the character of the bond, as enlightened by the legislative enactment giving rise to its issuance, is a question of law. E.g., United States Fidelity and Guarantee Co. v. Bross, supra; Morro Palisades Company v. Hartford Accident and Indemnity Co., supra; see also Radiology Professional Corporation v. Trinidad Health Association, supra. Given the existence of a specific legislative requirement for a bond, it is not unreasonable to assume that the principal purchased the bond and the surety issued it in order to accomplish the objectives outlined by the lawmaking body in requiring this form of security as a condition of performance.

■■■ The reason for requiring the subdivider to install street improvements is directly related to the public health, safety and welfare. Such a requirement assures suitable access routes, advances the objectives of the community plan, and protects the municipality and its taxpayers from the burden of constructing additional streets to accommodate new developments. 4 R. An-

derson, *American Law of Zoning* § 23.32 at 129 (1977). The Colorado Springs Subdivision Ordinance is intended to accomplish these purposes. Section 13–19(B)(4) of the Subdivision Ordinance leaves no doubt that the reason for the requirement of a bond or other form of security is "to secure to the city the actual construction and installation of all required street improvements if the improvements are not installed...." [6] This legislative language indicates an intent to secure to the city the cost necessary to complete the improvements upon the subdivider's default, as distinguished from an intent to exact a penalty for the total amount of the bond regardless of loss or damage to the city. If the city intended to impose a penalty for the subdivider's nonperformance, it could have given expression to such intent through the simple expedient of writing in its subdivision ordinance the requirement of a penalty bond. *See United States v. Dieckerhoff*, 202 U.S. 302, 26 S.Ct. 604, 50 L.Ed. 1041 (1906); *Clark v. Barnard, supra.* The specific terms of the Subdivision Ordinance, pursuant to which the security bond was executed, as well as the terms of the bond itself, lead us to conclude that the bond is an indemnity bond securing to the city the cost necessary to complete the construction and installation of the required street improvements.

Our holding is in accord with what we consider to be the better reasoned judicial precedent addressing this issue. In *Board of Supervisors of Fairfax County v. Ecology One*, 219 Va. 29, 245 S.E.2d 425 (1978), the Virginia Supreme Court had before it a surety bond guaranteeing to the county the construction of public improvements by the subdivider. The court construed the bond as an indemnity bond:

"Whether the bond in question is a penal bond or an indemnifying bond is to be determined by the language of the state enabling statute, the county ordinance, and the bond itself."

\* \* \* \* \* \*

"One of the main purposes of the enabling act and the County's ordinance is to require a subdivider to lay out and construct streets and other improvements in accordance with the state and county standards before the maintenance is taken over by a public agency and to relieve the public to this extent of the burden that would otherwise exist.

"There is nothing in the language of the bond, the state statutes, or the county ordinance to suggest that the bond was intended as a punishment for non-performance. On the contrary, the bond was intended to be an amount sufficient to pay construction costs, and upon failure of completion of the public improvements by the subdivider, the bond provided funds to the extent of the amount of the bond to cover the cost of completion of the improvements as then remained." 219 Va. at 36, 245 S.E.2d at 429, 430.

*See also County of Yuba v. Central Valley National Bank*, 20 Cal.App.3d 109, 97 Cal. Rptr. 369 (1971); *Pacific County v. Sherwood Pacific, Inc.*, 17 Wash.App. 790, 567 P.2d 642 (1977); *see also Town of Stoneham v. Savelo, supra.* A contrary construction could result in an unjustified windfall to the city by requiring a forfeiture of the entire amount of the bond no matter how trivial or insignificant the developer's nonperformance might be.[7]

---

6. The requirement of a bond or other form of security as a condition of plat approval also benefits the developer in that he may proceed with his development plans while the essential improvements are being installed. "If approval of a plat were ... delayed until the installation of required improvements, the development of land would be unnecessarily delayed, and the process would involve financial risks which the developer might be unwilling to take." 4 R. Anderson, *American Law of Zoning*, § 23.46 at 159 (1977).

7. For example, section 13–19(B)(4) lists as an additional purpose for the performance bond the securing to the city of "park and land fees; and drainage basin fees; and recording fees prior to consideration of the final plat by city council." A construction of the bond as a penalty bond conceivably could mean that the subdivider's failure to pay any of the above fees would result in a forfeiture. We do not believe the city council or the signatories to the bond intended such a severe sanction.

The defendants, relying on a construction of the contractual obligation as one of indemnifi-

While the city must establish its claim for damage by reason of MSIB's non-performance, the city's failure yet to have taken steps to complete the street improvements does not constitute a defense to its claim on the bond. *County of Los Angeles v. Margulis, supra; Pacific County v. Sherwood Pacific, Inc., supra.* Uncertainty as to the amount of damages is not an obstacle to recovery. *Westesen v. Olathe State Bank,* 75 Colo. 340, 225 P.2d 837 (1924); *Comfort Homes, Inc. v. Peterson,* 37 Colo.App. 516, 549 P.2d 1087 (1976). Generally, the measure of damages for a breach of contract is the loss in value to the injured party of the other party's performance caused by its failure or deficiency, plus any other incidental or consequential loss caused by the breach, less any cost or other loss that the injured party has avoided by not having to perform. *Restatement (Second) of Contracts,* § 347 (1981). Where a breach results in unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, the injured party may recover damages based on "(a) the diminution in the market price of the property caused by the breach, or (b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him." *Restatement (Second) of Contracts, supra,* § 348(2). Since the cost of completion usually will be less than the loss in value to the injured party, he is limited by the rule that damages are not recoverable for a loss that the injured party could have avoided. *Restatement (Second) of Contracts, supra,* § 348, Comment c. If a breach causes no loss or if the amount of loss is not proved, then "a small sum fixed without regard to the amount of loss will be awarded as nominal damages." *Restatement (Second) of Contracts, supra,* § 346. If damages are established, then it is a defendant's burden to produce evidence on which any reduction of damages is to be predicated. *E.g., Hoehne Ditch Co. v. John Flood Ditch Co.,* 76 Colo. 500, 233 P. 167 (1925); *Comfort Homes, Inc. v. Peterson, supra.* Although the amount of damages sustained by the city is an issue not before us at this time, we point out that the city's damage claim involves matters to be resolved at trial on the basis of a fully developed evidentiary record.

Our determination that the bond created an obligation to indemnify the city for the cost of the uncompleted street improvements disposes of the city's argument that the bond was a contract for liquidated damages. The terms of the bond contain no evidence whatever of a contractual intent to liquidate damages in advance of the contemplated performance, nor of the other elements essential to a contract for liquidated damages. *See Perino v. Jarvis,* 135 Colo. 393, 312 P.2d 108 (1957); *Turck v. Marshall Silver Mining Co.,* 8 Colo. 113, 5 P. 838 (1884); *Moore v. Kline,* 26 Colo.App. 334, 143 P. 262 (1914).

cation, argue that they cannot be held liable because the actual construction of the road improvements never commenced. They base their argument principally on *County of Yuba v. Central Valley National Bank,* 20 Cal.App.3d 109, 97 Cal.Rptr. 369 (1971). We find the facts of that case significantly dissimilar to those present here. In *County of Yuba* the security instrument was provided to the county in order to secure completion by the developer of street improvements in connection with a subdivision development. No work, however, had ever commenced on either the subdivision or the streets. The California court held that the obligor was not liable under the security instrument precisely because the instrument contemplated partial land development and street construction as a prerequisite to any obligation. In the instant case MSIB and Safeco, as parties to the bond, did not condition their obligation on the development of any land adjacent to the street extensions. Indeed, the street extension plat, to which the bond expressly referred, indicated that the land adjacent to the platted street extensions was undeveloped and unplatted. Thus the contractual obligation here is markedly different from that undertaken in *County of Yuba.* Moreover, in contrast to *County of Yuba,* there is evidence in this case that MSIB as developer already had spent approximately $50,000 on the street improvements prior to the work stoppage. We are satisfied therefore that MSIB as principal and Safeco as surety intended to secure to the city the construction and installation of the street extensions up to the amount of the bond, irrespective of the commencement of actual construction of the road improvements or partial completion thereof.

### III.

The record plainly shows that there are factual issues which render this case inappropriate for resolution by summary judgment. The city was the only party which moved for summary judgment in the district court. The trial court denied the city's motion but then entered summary judgment for the defendants.[8] In so doing the trial court deprived the city of an opportunity to present evidence on its loss or damage resulting from MSIB's failure to complete the street improvements.[9] Similarly the Court of Appeals, in reversing summary judgment for the defendants and ordering the entry of summary judgment in favor of the city, relieved the city of any obligation to prove its damages and precluded the defendants from litigating their affirmative defenses to the city's claim.[10]

Summary judgment is a drastic remedy to be granted only where the evidentiary and legal prerequisites are clearly established. *E.g., Fountain v. Filson*, 336 U.S. 681, 69 S.Ct. 754, 93 L.Ed. 971 (1949); *Gleason v. Guzman*, Colo., 623 P.2d 378 (1981); *McKinley Construction Co. v. Dozier*, 175 Colo. 397, 487 P.2d 1335 (1971); *Primrock v. Hamilton*, 168 Colo. 524, 452 P.2d 375 (1969). In this case there are genuine issues of material fact to be resolved relating to the claims and defenses of the parties.

The judgment of the Court of Appeals is reversed and the cause is returned to that court with directions to remand the case to the district court for further proceedings consistent with the views herein expressed.

8. The city claims that the trial court was without authority to grant summary judgment in favor of the non-moving defendants. In view of our disposition of the case, we need not decide this issue at this time.

9. Although the city, in connection with its summary judgment motion, argued that the bond was a penalty bond and proof of damages was unnecessary to recovery, it did not concede that it had suffered no damages.

10. Generally, a surety's liability is derivative and defenses available to the principal are available to the surety. *See, e.g., Associacion*

*de Azucareros de Guatemala v. U. S. National Bank of Oregon*, 423 F.2d 638 (9th Cir. 1970); *Star Contracting Corp. v. Manway Construction Co., Inc.*, 32 Conn.Super. 64, 337 A.2d 669 (1973). When the district court entered summary judgment for the defendant, there was pending before the court the defendants' motion to amend their answer to include other affirmative defenses to the city's claim. This motion to amend was never resolved and should be resolved by the district court upon remand.