**Donald O. PETERSON and Penelope G. Peterson, Petitioners,**

v.

**Barry HALSTED, Respondent.**

**Donald O. PETERSON and Penelope G. Peterson, Petitioners,**

v.

**Teresa BILLINGS, mother and best friend of her deceased child, Eva Marie Halsted, Respondent.**

Nos. 90SC418, 90SC519.

Supreme Court of Colorado, En Banc.

April 6, 1992.

Popham, Haik, Schnobrich & Kaufman, Ltd., Janet A. Savage, George G. Ventura, Mary C. Larson, Denver, for petitioners Donald O. Peterson and Penelope G. Peterson.

Sander N. Karp, Denver, for respondent Barry Halsted.

Theodore A. Borrillo, Denver, for respondent Teresa Billings.

Justice LOHR delivered the Opinion of the Court.

These two cases, consolidated in this court for briefing and argument, present common issues concerning the applicability of the tort doctrine of negligent entrustment. The cases arose out of an automobile accident in which Tamara Peterson, the twenty-five-year-old daughter of defendants Donald O. Peterson and Penelope G. Peterson, drove a vehicle while intoxicated and collided with an automobile carrying Barry Halsted, his wife Eleanor, and his daughter Eva Marie. Eleanor Halsted, Eva Marie Halsted, and Tamara Peterson all died as a result of the accident. Tamara Peterson had purchased her vehicle with her parents' assistance and had a history of excessive consumption of alcoholic beverages. Barry Halsted brought an action against Donald and Penelope Peterson for damages arising out of his injuries and the death of his wife. Teresa Billings, the mother of Eva Marie Halsted, brought a

separate action against the Petersons for damages caused by Eva Marie Halsted's death. Billings and Halsted based their claims on the theories of negligent entrustment and the family car doctrine.

In each case, the Adams County District Court granted the Petersons' motion for summary judgment on the claim of negligent entrustment for the reason that the Petersons lacked control and right of control over the vehicle driven by Tamara.[1] The Colorado Court of Appeals reversed the entry of summary judgment in both the Halsted and the Billings cases. *Halsted v. Peterson,* 797 P.2d 801 (Colo.App.1990); *Billings v. Peterson,* No. 89CA1304 (Colo. App. May 24, 1990) (not selected for publication). It held that genuine issues of material fact exist regarding the negligent entrustment claims. We granted certiorari in both *Halsted* and *Billings* to review the court of appeals' judgments reinstating those claims. We reverse the judgments.

## I.

We begin our analysis by setting forth familiar principles that govern resolution of motions for summary judgment. Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. C.R.C.P. 56(c). *Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1339–40 (Colo.1988); *United States v. Jesse,* 744 P.2d 491, 503 (Colo. 1987). A material fact is simply a fact that will affect the outcome of the case. *Mt. Emmons Mining Co. v. Town of Crested Butte,* 690 P.2d 231, 239 (Colo.1984). The purpose of summary judgment is to permit the parties to pierce the formal allegations of the pleadings and save the time and expense connected with trial when, as a matter of law, based on undisputed facts, one party could not prevail. *Id.* at 238. Summary judgment is a drastic remedy and should be granted only upon a clear showing that there is no genuine issue as to any material fact, *Jones v. Dressel,* 623 P.2d

---

1. In each case the Adams County District Court also granted partial summary judgment for the defendants on the family car doctrine claim. The Colorado Court of Appeals affirmed these rulings, and we denied certiorari to review the family car doctrine issue.

370, 373 (Colo.1981), and that all legal prerequisites are clearly established. *General Ins. Co. v. City of Colorado Springs*, 638 P.2d 752, 760 (Colo.1981).

In determining whether summary judgment is proper, the nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party. *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 736 (Colo.1991); *Tapley v. Golden Big O Tires*, 676 P.2d 676, 678 (Colo. 1983); C.R.C.P. 56(c). A court must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in determining whether to grant a motion for summary judgment. C.R.C.P. 56(c).

## II.

The claims for relief asserted by Barry Halsted and Teresa Billings are based on averments that the Petersons negligently entrusted a vehicle to Tamara Peterson. The record demonstrates that there is no genuine issue as to the existence of any of the facts that we now set forth.

Tamara Peterson was intoxicated when she negligently drove her Ford Bronco, failed to halt at a stop sign, and collided with Barry Halsted's vehicle on January 16, 1988. The deaths and injuries upon which the present cases are based resulted from that collision. At the time of the accident, Tamara was twenty-five years old and employed as a flight attendant. She had been so employed for three years. Tamara had moved out of her parents' home about seven years earlier and had maintained her residence at various other places. She returned to her parents' home, or to a trailer located behind the home, for brief periods while changing places of residence and sometimes returned to her parents' home for a few days while maintaining her residence in other places. Tamara provided her own means of support and had not been claimed by her parents as an exemption for tax purposes since 1985.

The Ford Bronco driven by Tamara Peterson on the day of the accident was the last of three vehicles that she had owned. The first was a Datsun given to her by her parents as a high school graduation present. The title was in her father's name. In September 1983, Donald Peterson signed a power of attorney to enable his daughter to sell the Datsun. She applied $2,000 of the proceeds to the purchase of a Porsche, which was titled in the name of her boyfriend. Penelope Peterson later provided $700 to Tamara to help her to make payments on the Porsche and avoid repossession. In February 1985, Tamara traded the Porsche and purchased the Ford Bronco. Title to the vehicle was listed in the names of Donald Peterson and Tamara Peterson as co-owners. Donald Peterson cosigned the loan documents with Tamara, thereby making it possible for her to finance the purchase. Donald Peterson also cosigned the sale contract for the vehicle as well as other documents executed incident to the purchase. The Peterson family address appeared on the Bronco registration. Registration papers, license plates, and title documents were sent to that address.

The Bronco was insured under Donald Peterson's policies at times, but later Tamara obtained her own insurance. She allowed her policy to lapse, and the vehicle was uninsured at the time of the accident in January 1988. Tamara made all payments on the Bronco while alive. The proceeds of a life insurance policy maintained by Tamara covered all but two of the remaining payments after her death. Donald Peterson made those two payments. On infrequent occasions, and with Tamara's permission, other members of the Peterson family used the Bronco.

The evidence leaves no room for dispute that Tamara had an alcohol problem of several years duration. In addition, her parents evidenced awareness of that difficulty. In 1980, Tamara Peterson collided with a fire truck when driving her Datsun while intoxicated; she had a blood-alcohol content of .163[2] and received a ticket for

2. For purposes of the criminal statute then in

effect prohibiting driving under the influence, a

driving under the influence. Both Donald and Penelope Peterson knew of this incident. Several of Tamara's friends attested to seeing Tamara inebriated in the presence of her parents on numerous occasions. There was also extensive additional testimony that Tamara consumed alcoholic beverages to excess. Gregory Shaw, a bartender at the bowling alley Tamara frequented, attested to seeing her intoxicated frequently. Penelope Peterson acknowledged in her deposition that she had consulted with Tamara about obtaining treatment for her alcohol problem.

On the day of the accident, Tamara attended chariot races[3] with some of her friends. When Tamara attempted to leave, her friends took the Bronco keys away from her because they thought she was too intoxicated to drive, but Tamara was able to obtain a substitute set of keys. Donald Peterson also attended the chariot races that day. He did not try to prevent Tamara from driving. He said that Tamara did not show evidence of alcohol impairment. The accident occurred shortly after Tamara drove away from the location where the chariot races were being held.

### III.

We now consider whether the tort doctrine of negligent entrustment is applicable to the facts as pleaded and developed further in the summary judgment proceedings. Concluding that the facts do not support negligent entrustment claims, we then consider whether summary judgment was proper when the claims are analyzed under general principles of negligence law. We conclude that even when so analyzed, the district court orders granting summary judgment were correct.

### A.

■ We discussed the law of negligent entrustment and its place in the tort law of negligence in our opinion issued today in *Casebolt v. Cowan*, 829 P.2d 352 (Colo. 1992), and will not repeat that discussion here. In *Casebolt* we discussed section 390 of the *Restatement (Second) of Torts* (1965) (hereinafter *"Restatement"*), expressing principles of negligent entrustment as applied to suppliers of chattels, and held that it establishes a useful framework for resolution of the issues of duty and adherence to the standard of care applicable to a supplier of chattels. Section 390 provides:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

We must determine whether the indirect facilitation of the purchase of a vehicle by a third person, as by Donald Peterson's lending his credit to Tamara, is sufficient to make that person a supplier of a chattel under section 390.

The Petersons did not give their daughter the Bronco or provide her with funds to purchase it.[4] Donald Peterson simply supplied his credit by cosigning the purchase money obligation, thereby enabling Tamara to come into possession of the vehicle. Tamara made the payments during her lifetime, and the proceeds of an insurance policy on her life paid almost the entire loan balance after her death. This raises the question of whether the Petersons' assistance in purchasing the vehicle was sufficient to make them suppliers for the pur-

---

blood-alcohol content of .10 or more gave rise to a presumption that the defendant was under the influence of alcohol. *See* ch. 414, sec. 1, § 42–4–1202(2)(c), 1979 Colo.Sess.Laws 1579.

**3.** Chariot races are races in which the participants ride in horse-drawn vehicles.

**4.** No argument has been made that Donald Peterson and Penelope Peterson are not identically situated for the purpose of the summary judgment issue, and we do not consider that possibility in this opinion.

pose of section 390 of the *Restatement*.[5]

Comment a to section 390 states:

> The rule stated applies to anyone who supplies a chattel for the use of another. It applies to sellers, lessors, donors or lenders, and to all kinds of bailors, irrespective of whether the bailment is gratuitous or for a consideration.[6]

These examples of suppliers all describe persons having possession or right to possession of a chattel at the time of entrustment and who directly supply the chattel to the user.

The purpose of the negligent entrustment doctrine is to articulate a set of standards that if met, establish the duty and breach elements of a negligence claim without the necessity for the detailed analysis that often is required to determine the existence of a duty. *Casebolt*, 829 P.2d at 358.[7] *Cf., e.g., Observatory Corp. v. Daly*, 780 P.2d 462, 466 (Colo.1989) (detailing policy considerations relevant to determination of duty); *University of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo.1987) (same); *Smith v. City & County of Denver*, 726 P.2d 1125, 1127–28 (Colo.1986) (same). We are persuaded that the circumstances in which money or credit may be lent to facilitate the purchase of a vehicle are so many and varied as not to be readily adaptable to the simplified resolution of the duty ques-

tion that results from the application of negligent entrustment analysis. *See McKenna v. Straughan*, 176 Cal.App.3d 910, 222 Cal.Rptr. 462, 465 (1986) (analyzing case under general negligence principles although pleaded as negligent entrustment). Policy considerations may vary depending on the relationship of the lender to the borrower, the financial circumstances of the borrower, and the time elapsed between the loan and any resulting injury, to name but a few relevant factors. Our general negligence law is well adapted to take into account and weigh such manifold and disparate considerations in arriving at a conclusion whether a particular lender owes a duty of care to a particular injured party. *See, e.g., Smith*, 726 P.2d at 1127; *Whitlock*, 744 P.2d at 57. Accordingly, we think it unwise and destructive of flexibility of analysis to classify suppliers of money or credit categorically as suppliers of chattels under section 390 even though the loan or credit may be essential to the borrower in obtaining possession of the chattel.[8]

## B.

We next address whether summary judgment for the defendants was appropriate in

---

**5.** As we held in *Casebolt*, 829 P.2d at 360, the relevant time for assessing negligent entrustment is the time at which the chattel is supplied to the entrustee.

**6.** We need not decide today whether to recognize the full scope of this definition of suppliers. Some jurisdictions have held sellers of cars to be suppliers. *See Flieger v. Barcia*, 674 P.2d 299, 301 (Alaska 1983) (car dealer selling vehicle obtained on consignment can be a supplier); *Vince v. Wilson*, 151 Vt. 425, 561 A.2d 103, 104–06 (1989) (auto sales dealer can be a supplier). The Colorado Court of Appeals has expressed a similar view. *Baker v. Bratrsovsky*, 689 P.2d 722, 723–24 (Colo.App.1984) (recognizing potential liability of car salesperson but finding no duty in the absence of actual knowledge that buyer had prior pattern of incompetent driving). *Contra Horne v. Vic Potamkin Chevrolet, Inc.*, 533 So.2d 261, 262–63 (Fla.1988) (relying in part on state statute in refusing to recognize potential liability of car salesperson).

**7.** We recognize, as we did in *Casebolt*, 829 P.2d at 359, that flexibility remains under § 390 be-

cause of the necessity to determine whether any risk created by the entrustor is *unreasonable*.

**8.** *But cf. McCart v. Muir*, 230 Kan. 618, 641 P.2d 384, 388 (1982) (applying negligent entrustment analysis in considering liability of father who had cosigned loan documents to enable son to purchase vehicle). In reaching a conclusion that negligent entrustment analysis is not appropriate in the present case, we express no opinion as to whether a person who makes a gift of money to enable another to buy a chattel, or who makes a gift of the chattel itself, can be considered a supplier of the chattel. Some courts have applied § 390 to find an entrustment in these circumstances. *See Vince*, 561 A.2d at 105–06; *Kahlenberg v. Goldstein*, 290 Md. 477, 431 A.2d 76, 83 (1981); *Golembe v. Blumberg*, 262 A.D. 759, 27 N.Y.S.2d 692, 692 (1941). Other courts have declined to impose liability under such facts. *E.g., Shipp v. Davis*, 25 Ala.App. 104, 141 So. 366, 367 (1932); *Estes v. Gibson*, 257 S.W.2d 604, 605 (Ky.App.1953); *Brown v. Harkleroad*, 39 Tenn.App. 657, 287 S.W.2d 92, 96 (1955).

each of these cases when they are analyzed under general negligence principles. An essential element of a general negligence claim is the existence of a duty by the defendant to the injured party. We therefore consider whether the Petersons owed a duty to the plaintiffs not to facilitate the acquisition of a vehicle by Tamara because of their knowledge of her habit of abuse of alcoholic beverages.

▇ It is for a court to determine as a question of law whether a person has a duty to act or refrain from acting to avoid injury to others. *E.g., Smith,* 726 P.2d at 1127; *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo.1980). This determination requires that a court consider many factors including, without limitation, "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor." *Smith,* 726 P.2d at 1127; *accord, e.g., Whitlock,* 744 P.2d at 57. No single factor controls, and in the final analysis "[a] court's conclusion that a duty does or does not exist is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection.'" *Whitlock,* 744 P.2d at 57 (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 53 at 358 (5th ed. 1984)) (hereinafter *"Prosser"*) (bracketed material added in *Whitlock*). The nature of the inquiry is essentially whether recognizing a duty would comport with fairness under contemporary standards. *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987); *Prosser* § 53 at 359.

▇ In the present case we conclude that the passage of so much time between the purchase of the vehicle and the accident militates against recognition of a duty to the victims of the accident. We are convinced that the community at large is not willing to recognize a responsibility that is of such a magnitude and that lasts indefinitely. *Cf. Prosser* § 53 at 359 (courts generally react to a situation in a way in which the great mass of people customarily react; as ideas of human relations change, the law as to duties changes with them).

▇ Tamara purchased the Bronco in February of 1985 and was involved in the fatal accident approximately three years later on January 16, 1988. Cases imposing liability on lenders or donors typically involve a much shorter time span between the loan or gift and the accident. *E.g., McKenna,* 222 Cal.Rptr. at 463 (accident occurred ten days after the purchase of the vehicle; general negligence analysis); *Kahlenberg v. Goldstein,* 290 Md. 477, 431 A.2d 76, 81 (1981) (accident occurred six days after the purchase of the vehicle; negligent entrustment analysis). Tamara had been fully employed as a flight attendant for three years preceding the accident and had lived outside her parents' home for years except for brief and sporadic visits. The Petersons had no control over the driving activities of their adult daughter for at least as long as she had owned the Bronco.[9] Continuing control, or its absence, is a factor in determining the existence of a duty when time has elapsed between supplying a vehicle to a user and the occurrence of an injury-causing accident. *See McCart,* 641 P.2d at 388; *Wright v. Neale,* 79 Md.App. 20, 555 A.2d 518, 522 (1989); *McCarson v. Foreman,* 102 N.M. 151, 692 P.2d 537, 540–43 (N.M.App.1984); *cf. Casebolt,* 829 P.2d at 360 (continuing control may give rise to a duty of entrustor to take reasonable steps to terminate entrustment in some circumstances).

In short, we conclude that any duty owed by the Petersons to avoid facilitating their daughter's conduct in driving while intoxicated did not extend to the victims of the accident in the present case. The link between the Petersons' actions and injuries to

---

9. There was evidence that on a single occasion the parents took Tamara's keys to the Bronco and kept them overnight. The evidence does not suggest, however, that they had any right to do so.

the victims is simply too attenuated.[10]

## IV.

We conclude that under the facts developed in the summary judgment proceedings, the Petersons owed no duty to the plaintiffs or to the persons under whom the plaintiffs derive their interests, and therefore the summary judgments for the defendants were proper. We reverse the judgments of the Colorado Court of Appeals and remand the cases to that court for reinstatement of the district court's summary judgments for the defendants.

VOLLACK, J., specially concurs.

Justice VOLLACK specially concurring in the judgment only:

I agree with the majority's conclusions that "the Petersons owed no duty to the plaintiffs," and that "the summary judgments for the defendants were proper." Maj. op. at 380. I disagree, however, with the majority's application of section 390, governing entrustment of chattels to known incompetents, and the majority's holding in *dicta* that lenders of money or credit can be suppliers of chattels with respect to liability for negligent entrustment.

## I.

In the companion case to the present action, *Casebolt v. Cowan,* 829 P.2d 352 (Colo.1992), this court recognizes the doctrine of negligent entrustment, noting that it is followed in a majority of jurisdictions. *Casebolt,* 829 P.2d at 357–59; *see also Casebolt* (Vollack, J., dissenting), 829 P.2d at 370. In the present case, the majority reiterates that section 390 "establishes a useful framework for resolution of the issues of duty and adherence to the standard of care applicable to a supplier of chattels." Maj. op. at 377; *Restatement (Second) of Torts* § 390 (1965). I disagree.

**10.** An alternate mode of analysis is available under the rubric of proximate cause. The passage of time and Tamara's employment as a flight attendant suggest that she would have been able to purchase a vehicle without her parents' help well before the accident occurred.

Section 390 [hereinafter "section 390"] of the *Restatement (Second) of Torts* (1965) [hereinafter "*Restatement*"] is a more narrow application of the general doctrine of negligent entrustment set out in section 308 of the *Restatement. See Casebolt* (Vollack, J., dissenting), 829 P.2d at 371. In my dissent, I detail the manner in which section 390 has consistently been applied in accord with its narrow purpose. *Casebolt* (Vollack, J., dissenting), 829 P.2d at 370–72. I need not repeat that discussion here. I write separately here because I believe the present case does not come within the ambit of section 390 for two reasons: because Tamara Peterson cannot be considered a "person *known to be incompetent,*" and because lenders of money or credit can never be suppliers of chattels.

## II.

On January 16, 1988, Tamara Peterson (Tamara) drove her Ford Bronco, while intoxicated, and collided with Barry Halsted's vehicle. Tamara and two passengers in Halsted's car died as a result of the collision.

Tamara was then twenty-five years old. Other than infrequent overnight visits, Tamara had maintained her own residence apart from her parents, the Petersons, for approximately seven years, since she graduated from high school. During that seven-year period, Tamara was financially independent from the Petersons, with the exception of having accepted one $700 gift which she used to make payments on her car.

Eight years before the collision, in 1980, Tamara received a ticket for driving under the influence. Tamara completed a level I counseling program as a consequence of the ticket. The Petersons were aware of both the ticket and of Tamara's participation in the counseling program.

*See Talbott v. Csakany,* 199 Cal.App.3d 700, 245 Cal.Rptr. 136, 139 (1988); *Kahlenberg,* 431 A.2d at 84–85. We did not grant certiorari to address proximate cause, which in any event is usually a jury question. *See Largo Corp. v. Crespin,* 727 P.2d 1098, 1103 (Colo.1986).

On February 13, 1985, Tamara purchased the Bronco. Donald Peterson co-signed with Tamara the Colorado retail install-ment contract, a Ford Motor Credit Compa-ny Application, and the odometer mileage statement. Both Tamara's and Donald Pe-terson's names, and Donald Peterson's ad-dress, appeared on the vehicle title.

From 1985 until 1988, Tamara made all payments on the Bronco. At times, the Bronco was insured under Donald Peter-son's policy, but later Tamara insured the vehicle. While Tamara kept extra copies of her car keys, she did not allow either Don-ald or Penelope Peterson to have and main-tain spare car keys.

The Halsteds brought suit against the Petersons on theories of negligent entrust-ment and the family car doctrine. The district court granted summary judgment in favor of the Petersons on the negligent-entrustment claim, noting that no matter how the Bronco was technically titled, the Petersons did not have control over it.

In my opinion, Tamara Peterson cannot logically be categorized as a person *known to be incompetent* under section 390. She was older than sixteen years of age, was licensed to drive, and suffered no obvious physical or mental impairments when she purchased the Bronco. The Petersons could not have concluded that Tamara was incompetent based on their knowledge of her one DUI conviction five years prior to the purchase of the Bronco.

The majority states that "[t]he evidence leaves no room for dispute that Tamara had an alcohol problem of several years['] duration." Maj. op. at 376. The majority further states that "her parents evidenced awareness of that difficulty." *Id.* I am not convinced, however, that the Petersons' awareness of Tamara's conduct rises to the level of knowledge required for liability under section 390. The Petersons did not testify that they were aware of a problem 'of several years' duration.' Mrs. Peterson did state that she once consulted Tamara about obtaining treatment. Mrs. Peter-son's testimony does not, however, estab-lish the context in which this single state-ment was made. Accordingly, section 390

should not be used to analyze liability in this case.

## III.

The majority is "persuaded that the cir-cumstances in which money or credit may be lent to facilitate the purchase of a ve-hicle are so many and varied as not to be readily adaptable to the simplified resolu-tion of the duty question that results from the application of negligent entrustment analysis." Maj. op. at 378. This statement strips section 390 of its essence: that a supplier is someone who has "possession or right to possession of a chattel at the time of entrustment and who *directly* suppl[ies] the chattel" to the entrustee. Maj. op. at 378 (emphasis added). Someone who loans money or credit clearly does not have pos-session or a right to possession of a chattel.

In my view, the majority's opinion impos-es a new duty on lenders to make indepth inquiries as to an applicant's persona, at the time of the loan, in order to avoid future liability when the applicant procures a chattel at some indefinite future moment. Creation of such a duty stretches the appli-cation of section 390 beyond its intended scope. Section 390 imposes liability where a "supplier knows or has reason to know" that an entrustee is likely to misuse a chat-tel. *Restatement* § 390 (1965). Section 390 does not affirmatively require lenders to delve into potential users' lives to dis-cover any of the myriad characteristics which may render a user unfit. Thus, the majority correctly notes "that the commu-nity at large is not willing to recognize a responsibility that is of such a magnitude and that lasts indefinitely." Maj. op. at 379.

I do not imply, by excluding lenders of money or credit from liability under section 390, that lenders can never be liable for negligence. Lenders may be implicated in a chain of causation and found liable under a general case of negligence. *See general-ly Ekberg v. Greene,* 196 Colo. 494, 588 P.2d 375 (1978).

Based on the foregoing discussion, I would affirm summary judgment in favor of the Petersons.