Jesse ANDERSON, Plaintiff–Appellant,

v.

VAIL CORPORATION, a Colorado corporation, d/b/a Vail Associates, Defendant–Appellee.

No. 09CA1567.

Colorado Court of Appeals, Div. III.

Sept. 16, 2010.

Scott R. Larson, P.C., Scott R. Larson, Denver, Colorado, for Plaintiff–Appellant.

The Rietz Law Firm, LLC, Peter W. Rietz, Maryjo C. Falcone, Dillon, Colorado, for Defendant–Appellee.

Opinion by Judge ROY.

Jesse Anderson (skier # 1) and Melissa Ciocian (skier # 2) [1] and Chris Ciocian appeal the entries of summary judgment in favor of the Vail Corporation (ski resort) in their respective cases. These two appeals, though arising from different skiing accidents and different civil cases, are consolidated for the purpose of the opinion because they present virtually identical facts, the same legal issues, and the parties are represented by the same counsel. Slight factual differences between the two cases are noted.

The skiers argue that the trial court erred by: (1) concluding that there was no genuine issue of any material fact and that the ski resort was entitled to judgment as a matter

---

1. Melissa Ciocian was snowboarding at the time of her accident, but under the Ski Safety Act the term " '[s]kier' means any person using a ski area for the purpose of skiing, which includes, without limitation, sliding downhill or jumping on snow or ice on ... a snowboard ...." § 33–44–103(8), C.R.S.2010. Therefore, we will refer to her as a skier.

of law as to the marking of the ski resort's boundary; (2) relying on photographs, submitted without proper foundation, as attachments to the ski resort's reply brief in support of summary judgment; (3) concluding that the ski resort's exculpatory agreement did not violate public policy; and (4) concluding that the ski resort's exculpatory agreement was clear and unambiguous.

We agree with skiers that there is a genuine issue of material fact, which precludes the entry of summary judgment on the issue of whether the ski resort boundary was adequately marked, and, therefore, we need not address whether the trial court could properly consider the disputed photographs. We also agree with the skiers, and the ski resort concedes, that if the ski resort failed to properly mark the ski area boundary as required by the statute, the exculpatory agreement does not release the ski resort from liability. Therefore, we need not consider whether the exculpatory agreement is clear and unambiguous. Thus, we vacate the trial court's orders granting summary judgment, and remand for further proceedings.

## I.  Facts

Primrose, an intermediate (blue) trail, commences at the top of Larkspur Bowl. Primrose splits shortly thereafter, and the left fork remains Primrose but becomes a beginner's (green) trail; the right fork becomes Bitterroot, an intermediate trail. Two ski lifts, Strawberry Park Express and Upper Beaver Creek Mountain Express, terminate just below the split, affording access to Primrose, Bitterroot, and a glade, which is a forested area with no separate difficulty rating, separating Primrose and Bitterroot. Some distance downhill from the split, Primrose and Bitterroot are connected by Overshot, a trail or catwalk,[2] which cuts through and traverses the glade commencing at Primrose and terminating at Bitterroot. Because

it terminates at an intermediate (blue) trail, Overshot itself is an intermediate (blue) trail.

The downhill edge of Overshot is a ski area boundary. Immediately below the boundary are three private ski in-ski out residences built on private property. Immediately below the residences is a paved access road.

Skier # 1's accident occurred on February 25, 2007, and skier # 2's accident occurred on March 3, 2007. Both skiers skied off of the Strawberry Park Express Lift. Skier 2 immediately entered the glade. It is not clear where Skier 1 entered the glade. The glade is not closed to skiers, is within the ski resort's area boundaries, and extends below Overshot.

Skiers proceeded though the glade until they reached Overshot, crossed Overshot near its downhill terminus, and continued downhill through the glade. Skier # 2 noticed "the very different surroundings and the drastic change in terrain," but she testified that the trees were "fairly spread out," with "natural gaps" that "made it easy to turn." Skier # 1 acknowledged he did not look up Overshot as a skier would normally do when crossing a trail, and estimated his speed at twenty miles an hour, or approximately thirty feet per second.[3] There is no evidence of the width of Overshot at the point of crossing but the ski resort's counsel, in oral argument, estimated its width as approximately thirty feet. Shortly after crossing Overshot, the skiers skied off of a 19–foot retaining wall, dropped onto the paved access road, and sustained injuries.

Skiers do not dispute that there were nine ski area boundary signs facing uphill across Overshot, to their left, as they crossed Overshot. These signs are located at various points along the downhill side of Overshot, 24 to 51 yards apart, over a distance of 303 yards. A double strand rope closure terminates 44 yards uphill from the first sign, and another rope closure commences 72 yards

---

2.  A "catwalk" is "a gentle, narrow trail that joins one ski slope to another or that winds down the entire mountain." www.rei.com/expertadvice/articles'skiing"+glossary.html (last visited 7/30/2010). Catwalks frequently look like roads and are used by maintenance vehicles and equipment to traverse the mountain.

3.  Speed in feet/second can be estimated by multiplying the speed in miles per hour by 1.5. Thus 5,280 feet, the distance traveled in one minute by a vehicle driving sixty miles per hour, divided by sixty (the number of seconds in a minute) yields eighty-eight feet per second, an error of 2.22%.

downhill from the last sign. Skiers skied through this 72 yard gap approximately 56 yards downhill from the last sign and 16 yards uphill from the rope closure. Skiers testified in their depositions that they had no knowledge that the wooded area downhill from Overshot was closed to the skiing public and that they did not see any boundary signs or rope closures.

Skier's safety expert (the expert), who visited the scene on April 3, 2007, stated in his report that (1) the forest area (glade) above Overshot "was an open and well skied forest ... suitable for recreational resort skiing and snowboarding"; (2) the boundary signs to the skiers' left were "virtually invisible ... and unreadable in any case as [the nearest sign] would have been edge on to [the skiers'] line of sight as [they] crossed Overshot"; and (3) the rope closure to the skiers' right and downhill was "hidden behind trees and not visible at all." The expert also opined that the ski resort failed to post sufficient boundary signs and rope closures alerting skiers to the ski area boundary.

With respect to skier #1, a responding member of the ski patrol testified in his deposition that he "could see how this happened" and responded affirmatively to the question, "you didn't believe that it was sufficiently clear that that was the area boundary?" With respect to skier #2, the ski patrol supervisor confirmed that he probably told her that there was "no way she could have known the trees were beyond the ski area boundary and, therefore, it was not her fault," or words to that effect.

The trial court granted summary judgment in favor of the ski resort based on its finding that "after thoroughly reviewing the number, location and orientation of nine (9) boundary signs, the Court finds them to be 'in a fashion readily visible to skiers under conditions of ordinary visibility' consistent with C.R.S. § 33–44–107(6) [the Ski Safety Act] and within the reasonable standards established in the legislative declaration of the Ski Safety Act." Further, based on this finding, the trial court found that the exculpatory agreements did not supplant the ski resort's statutory duties and did not offend public policy based on the *Jones v. Dressel,* 623 P.2d 370, 376

(Colo.1981) factors, and were clear and unambiguous.

## II. Summary Judgment

Skiers contend that the trial court improperly applied the summary judgment standard. More specifically, they argue the trial court improperly made findings of fact on disputed issues of material fact. We agree.

### A. Standard of Review

We review an order granting summary judgment de novo. *BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 71 (Colo.2004). Summary judgment should be granted only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Peterson v. Halsted,* 829 P.2d 373, 375 (Colo.1992). A litigant is entitled to have disputed facts determined by the finder of fact following a trial, and it is only in the clearest of cases, where no doubt exists concerning the facts, that summary judgment is warranted. *Moses v. Moses,* 180 Colo. 397, 402, 505 P.2d 1302, 1304 (1973). Summary judgment is only appropriate in those circumstances where there is no role for the fact finder to play.

In determining whether summary judgment is proper, the court must give the party opposing the motion the benefit of all favorable inferences that reasonably may be drawn from the facts presented. *Peterson,* 829 P.2d at 376. "[T]he trial court may not assess the weight of the evidence or credibility of witnesses in determining a motion for summary judgment...." *Kaiser Found. Health Plan of Colo. v. Sharp,* 741 P.2d 714, 718 (Colo.1987).

■ Statutory interpretation is a question of law that we review de novo. *Fischbach v. Holzberlein,* 215 P.3d 407, 409 (Colo. App.2009). Our primary duty in construing legislation is to effectuate the intent of the General Assembly, looking first to the statute's plain language. *Vigil v. Franklin,* 103 P.3d 322, 327 (Colo.2004). When legislative language is ambiguous, we construe the statute in light of the General Assembly's objective, employing the presumption that the leg-

islature intended a consistent, harmonious, and sensible effect. *Matter of Title, Ballot Title & Submission Clause, & Summary for 1997–98 No. 62*, 961 P.2d 1077, 1079 (Colo. 1998).

### B. Analysis

Skiers alleged in the trial court, and now argue here, that the ski resort acted negligently and violated the Act by failing to properly mark the ski area boundaries. Skiers premise their allegations and arguments on section 33–44–107(6), which provides: "The ski area operator shall mark its ski area boundaries in a *fashion readily visible to skiers* under conditions of ordinary visibility." (Emphasis added.) Skiers argue that the ski area failed to comply with section 33–44–107(6) because there were no boundary signs or other markings alerting them that they were approaching a ski area boundary.

The trial court found that the ski resort marked its boundary in a fashion readily visible to skiers under conditions of ordinary visibility based solely on the placement of the nine boundary signs over the distance of 303 yards along the downhill side of Overshot.

The legislative declaration of the Act provides:

> The general assembly hereby finds and declares that it is in the interest of the state of Colorado to establish reasonable safety standards for the operation of ski areas and for the skiers using them. Realizing the dangers that inhere in the sport of skiing, regardless of any and all reasonable safety measures which can be employed, the purpose of this article is … to further define the legal responsibilities of ski area operators and their agents and employees; to define the responsibilities of skiers using such ski areas; and to define the rights and liabilities existing between the skier and the ski area operator and between skiers.

§ 33–44–102, C.R.S.2010. The Act then provides the duties of both ski area operators and skiers. Further, the Act states, "A violation by a ski area operator of any requirement of this article … shall, to the extent such violation causes injury to any person or damage to property, constitute negligence on the part of such operator." § 33–44–104(2), C.R.S.2010.

The trial court correctly noted that section 33–44–107(6) "does not explicitly or implicitly require a certain number, specific placement or distance between ski area boundary signs." However, the statute requires that the boundary must be marked in a fashion readily visible to *skiers*. § 33–44–107(6). A "[s]kier" is defined as "any person using a ski area for the purpose of skiing … or for the purpose of using any of the facilities of the ski area, including but not limited to ski slopes and trails." § 33–44–103(8). And, "[s]ki slopes or trails" are defined as "all ski slopes or trails and *adjoining skiable terrain*, including all their edges and features, and those areas designated by the ski area operator to be used by skiers for any of the purposes enumerated in subsection (8) of this section." § 33–44–103(9), C.R.S.2010 (emphasis added).

■ Under this language, ski area operators do not simply have a duty to mark ski area boundaries in a fashion readily visible to skiers who are located in certain "designated" areas; but instead, they are required to mark boundaries in a fashion readily visible to any person skiing on a slope, trail, or adjoining skiable terrain. The ski resort protests that such a reading would create an "impossible burden" because it cannot anticipate how skiers on its ski slopes and trails will be approaching ski area boundaries. However, skiing past boundary lines presents serious consequences, and the General Assembly dictated this strict requirement. In addition, we note that the "reasonableness" standard in the legislative declaration will impact the factual determination of whether a ski resort met the requirements of the statute.

■ Skiers presented evidence that the boundary signs were not readily visible to skiers in their line of travel; the closest being more than fifty yards uphill from the crossing and none downhill, the direction toward which skiers tend to apply more focus. According to a site diagram, the distance between the end of the uphill and downhill rope line is 419 yards. There are nine ski

area boundary signs (and therefore ten gaps) over that distance. Eight of the signs (eight gaps) are immediately above three residences. The longest of the gaps is 51 yards, the shortest is 24 yards, and the average gap is 39 yards. The ninth gap, through which the skiers skied, and below which is glade, is 72 yards. Further, the skiers' expert testified in his deposition that the downhill rope closure was not visible to the skiers, a fact which the ski resort may dispute. A member of the ski resort's ski patrol admitted that he could see how this happened, implying that the boundary was inadequately marked. The evidence presented, viewed in the light most favorable to skiers, presents a genuine issue of material fact as to whether the boundary signs were "readily visible" to skiers approaching Overshot near its downhill terminus.

The ski resort's argument that section 33–44–109(5), C.R.S.2010, creates a presumption that the skiers "have seen and understood all information posted" is unpersuasive because the statute conditions this presumption on "all information posted in accordance with this article...." Therefore, the presumption is only effective if the ski resort complied with section 33–44–107(6), which, ultimately, is a question that must be submitted to the trier of fact if, as here, there is conflicting evidence.

The ski resort's argument that under section 33–44–109(5), the skiers had a duty to "locate and ascertain" its boundary signs is also misplaced because this duty is only placed upon skiers in "decreased visibility" and only in the event the ski resort boundary lines are marked in accordance with section 33–44–107, C.R.S.2010. " 'Conditions of normal visibility' means daylight and, where applicable, nighttime in nonprecipitating weather." § 33–44–103(3), C.R.S.2010. There is evidence that both accidents occurred during daylight hours and that the weather was

clear and visibility was good. The weather and general visibility, notwithstanding, it may well be that skiing through trees limits visibility and diverts attention. However, if the skiers' statutory duty arises, the issue of whether the skiers breached that duty is also a question of fact addressed to the trier of fact in the event there is conflicting evidence.

Viewing the evidence in the light most favorable to skiers, we conclude that there are legitimate disputes of material fact as to whether the ski resort boundary was adequately marked. Therefore, summary judgment was inappropriate, the orders must be vacated, and the case must be remanded for further proceedings.

### III. Photographs

Next, skiers argue that the trial court inappropriately relied upon unauthenticated photographs submitted by the ski resort with its reply brief. Because of our resolution of skiers' first argument, we need not address this issue.

### IV. Exculpatory Agreement

The ski resort also argued in the trial court that skiers' claims were barred by the Season Pass Application, which included an exculpatory agreement[4] that both skiers signed. However, the ski resort conceded in its briefs on appeal, and in oral argument, that it "is not (and did not) attempt to contract away its *statutory duties,* rather, the exculpatory agreement precludes only those claims for negligence above and beyond the requirements with which [ski resort] was statutorily required to comply, and with which it did comply." (Emphasis in original answer briefs.) The ski resort also admits that "[its] release does not supplant [its] statutory duties," and that its "liability waiver does not dilute or limit the statutory duties with which it must comply. Rather, [its] waiver precludes any claim for negli-

4. The exculpatory agreement stated, in pertinent part, as follows:

The Undersigned expressly ASSUMES ALL RISKS associated with holder's participation in the Activity, known or unknown, inherent or otherwise.... The Undersigned understand and acknowledge: ... 2) Holder is responsible for reading, understanding, and complying with all signage.... IN CONSIDERATION OF ALLOWING HOLDER TO USE THE SKI AREA FACILITIES, THE UNDERSIGNED AGREE TO HOLD HARMLESS, RELEASE, DEFEND, AND INDEMNIFY ... [THE SKI RESORT] FROM ANY AND ALL LIABILITY....

gence or liability beyond those statutory duties with which [it] is required by law to comply...."

Therefore, the ski resort agrees with skiers on the scope of the exculpatory agreement and we need not address the issue further. It logically follows that we need not address skiers' argument that the exculpatory agreement was ambiguous.

We reverse the summary judgments and remand for further proceedings consistent with the views expressed in this opinion.

Judge ROMÁN and Judge BOORAS concur.