## MESSER GRIESHEIM INDUSTRIES, INC. d/b/a MG Industries,

v.

## CRYOTECH OF KINGSPORT, INC., et al.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Jan. 12, 2001.

Application for Permission to Appeal Denied by Supreme Court May 14, 2001.*

---

* The Supreme Court recommended that the Court of Appeals' opinion be published.

590

Gregory M. Leitner, Michael K. Alston, and Timothy L. Mickel, Chattanooga, TN, and Arthur G. Seymour, Jr., Knoxville, TN, for appellant, Messer Griesheim Industries, Inc., d/b/a MG Industries.

Hugh J. Moore, Jr., Douglas E. Peck, and Stephen G. Kabalka, Chattanooga, TN, for appellee, Mellon Financial Services Corp. # 3.

## OPINION

SUSANO, J., delivered the opinion of the court, in which GODDARD, P.J., and SWINEY, J., joined.

This is an action to recover damages, primarily funds expended by the plaintiff in settlement of claims against it that allegedly resulted from property damage caused by contaminated liquid carbon dioxide sold by the plaintiff. The plaintiff, who is now the appellant, filed suit against Mellon Financial Services Corp. # 3—the defendant-appellee—and two others who were involved in the chain of distribution of the carbon dioxide. The trial court granted the defendant-appellee's original motion for summary judgment, dismissing the plaintiff's breach of contract and breach of warranty claims for lack of privity, the plaintiff's products liability claim due to a lack of property damage, and the plaintiff's Tennessee Consumer Protection Act claim. Subsequently, the trial court granted the defendant-appellee's second motion for summary judgment, dismissing the plaintiff's remaining claims, predicated on the court's finding that the defendant-appellee owed no duty to the plaintiff and that the defendant-appellee was not involved in a joint venture or an implied partnership with the other defendants. The plaintiff appeals, raising numerous issues. We affirm.

## I. *Background*

The plaintiff, Messer Griesheim Industries, Inc. ("MG"), sells carbon dioxide to customers for use in carbonated beverages and for medical-related purposes. Beginning in April, 1993, MG purchased carbon dioxide from a facility operated by the defendant Cryotech of Kingsport, Inc. ("Cryotech").[1] Cryotech is in the business of locating, constructing and operating gas purification facilities.

The Cryotech facility involved in this case was located on property leased from the defendant Eastman Chemical Company ("Eastman").[2] The lease between Cryotech and Eastman provides that Cryotech was permitted to place buildings and other improvements on the property, provided Cryotech first submitted plans to Eastman for approval. In addition to the lease, Eastman and Cryotech executed a "feedgas agreement" pursuant to which Eastman agreed to supply Cryotech with the feedgas required to produce carbon dioxide. The feedgas agreement includes a description of the typical composition of carbon dioxide gas. The description does not include cyanide.

Subsequent to the execution of the feedgas agreement, Cryotech sought a construction loan from the defendant-appellee, Mellon Financial Services Corp. # 3 ("Mellon").[3] Before closing its construction loan to Cryotech, Mellon reviewed the feedgas agreement between Cryotech and Eastman and the results of a performance test which reflected that the cyanide content of the feedgas must not exceed the range of zero to two parts per million by volume. Mellon also tested the Eastman feedgas and was apparently satisfied with the results. Being aware that contaminated carbon dioxide could render Cryotech's product unmarketable, Mellon demanded and received assurances from Eastman that the cyanide content of the feedgas would not exceed acceptable limits.

In addition to examining the feedgas and the related agreements, Mellon approved the design of the facility and took an active role in assuring that the plant was properly constructed. After the facility was constructed, the financing agreement between Mellon and Cryotech was converted into a lease of the structure and related equipment, with Mellon denominated the owner-lessor and Cryotech the lessee. This arrangement provided Mellon with certain tax benefits which translated into cheaper lease payments for Cryotech.

The lease agreement between Mellon and Cryotech, among other things, (1) required Cryotech to operate the facility in a careful and proper manner; (2) required Cryotech to comply with and conform to all applicable laws; (3) required Cryotech to maintain the facility in good repair, condition, and working order; (4) required Cryotech to give Mellon notice of any material adverse changes in its business, operations, condition, or prospects; (5) gave Mellon the value of any and all improvements made by Cryotech to the facility; (6) granted Mellon the right to inspect the facility and Cryotech's books; and (7) gave Mellon certain rights upon Cryotech's default, including the right to take possession of the facility, the right to either operate the facility or evict Cryotech, and the right to sell the facility.

In addition to its involvement by way of the lease with Cryotech, Mellon was also involved in the relationships between Cryotech and the latter's suppliers and

---

1. Cryotech is not involved in this appeal.

2. Eastman is not involved in this appeal.

3. Mellon has since changed its name to Mellon Leasing Corporation.

customers. For instance, Mellon and Eastman entered into an agreement which provided that the feedgas agreement between Cryotech and Eastman could not be amended without Mellon's consent. Mellon also considered itself, by virtue of its lease with Cryotech, an actual party to the feedgas agreement between Cryotech and Eastman. In addition, Cryotech assigned its supply agreements to Mellon.

Throughout the period of the lease, Mellon was aware that Cryotech was a small, leveraged operation that could be significantly hindered in its business by any financial setbacks.

By March, 1993, Cryotech began to experience problems due to the fact that Eastman's feedgas contained unacceptable levels of cyanide, a potentially lethal toxin. The presence of these unacceptable levels of cyanide required Cryotech to expend significant sums of money to purify the feedgas, which in turn hindered Cryotech's ability to pay Eastman on the ground lease. Cryotech found itself more than $1,000,000 in arrears in its obligations to Eastman.[4]

Because of its financial difficulties, Cryotech also defaulted on its lease payments to Mellon. As a consequence, Mellon agreed to accept partial payments from Cryotech and apply them to the balance due under the lease and decided to closely monitor Cryotech's operations. It also required Cryotech to furnish it cash or cash updates every two weeks. Throughout the period of the lease, Mellon forgave certain defaults of Cryotech, including the latter's failure to timely submit audited financial statements. It continued to lease the subject property to Cryotech.

Mellon knew of the cyanide in the feedgas no later than November 8, 1995. On April 15, 1996, one of MG's customers complained of odors in and the taste of the carbon dioxide it had received from the Cryotech facility. Subsequent testing confirmed the presence of cyanide in the carbon dioxide. Several of MG's customers, in producing their products, mixed the contaminated carbon dioxide with other ingredients and packaged it in consumer containers. MG reached settlements with and compensated many of its customers for the various losses they sustained. In addition, several other claims are pending.[5] MG claims damages in excess of $7,792,930 as a result of the damage sustained by its customers. Subsequent to MG's discovery of cyanide in the carbon dioxide, Mellon took possession of the facility from Cryotech.

In 1996, MG filed suit in federal court against Cryotech, Eastman, and Mellon, alleging that the defendants were liable under multiple theories. On February 4, 1997, MG filed an almost identical complaint in Knox County Circuit Court. This complaint alleged (1) breach of contract; (2) breach of warranty; (3) intentional and/or negligent misrepresentation; (4) products liability; (5) ultra-hazardous activity; (6) negligence; (7) third-party beneficiary; (8) negligent supervision/failure to act; (9) gross negligence, recklessness, and outrageous conduct/failure to warn; (10) intentional concealment; (11) negligent lease of defective property/equipment; (12) joint venture/implied partnership; (13) misrepresentation; (14) violation of the Tennessee Consumer Protection Act ("TCPA"); (15) violation of the Consumer

---

4. This fact of default also constituted a default under the lease between Cryotech and Mellon.

5. As a part of these settlements, MG obtained releases pursuant to which customers specifically released Eastman, Cryotech, and Mellon from liability arising out of the contaminated carbon dioxide.

Product Safety Act; and (16) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The breach of contract, breach of warranty, products liability, and TCPA claims are hereinafter sometimes referred to as "the product claims." The remaining claims, excluding the Consumer Product Safety Act and the RICO claims, are hereinafter referred to as "the remaining claims."

The state suit was subsequently removed to federal court and consolidated with the federal suit. When the federal court dismissed the federal claims, the state claims were remanded back to the state court.

In June, 1997, Mellon filed a motion for a protective order seeking to stay discovery pending resolution of its motion for judgment on the pleadings. Eastman also sought to stay discovery. The trial court, on July 28, 1997, (1) denied Mellon's motion for judgment on the pleadings; (2) partially granted Mellon's motion for a protective order, giving Mellon more time to respond to MG's written discovery; and (3) granted Eastman's motion to stay discovery, ordering that Eastman respond to MG's discovery 30 days after filing its answer.

On or about July 29, 1997, Eastman filed a motion to dismiss or for summary judgment. In October, 1997, the trial court dismissed MG's breach of contract claim against Eastman due to a lack of privity between Eastman and MG; dismissed MG's breach of warranty claim against Eastman, again due to a lack of privity; dismissed MG's products liability claim against Eastman due to a lack of property damage; and dismissed MG's TCPA claim against Eastman. On October 15, 1997, MG filed an amended complaint "in order to more specifically allege property damage, as well as to specifically allege that it

was entitled to stand in the shoes of its customers."

On January 19, 1998, Mellon filed its first motion for summary judgment, arguing (1) that the trial court's ruling relating to Eastman should apply equally to Mellon; and (2) that the remaining claims against Mellon should be dismissed because Mellon owed no duty to MG and because Mellon was neither a partner nor a joint venturer with either Cryotech or Eastman.

At a March 20, 1998, hearing, the trial court denied the motion for summary judgment and permitted MG to take additional discovery. On April 22, 1998, the trial court granted Mellon's motion for summary judgment as to the product claims, but denied Mellon's motion as to the remaining claims, opining that MG was entitled to engage in additional discovery.

On October 15, 1998, MG filed a motion to amend seeking permission to file a second amended complaint. This motion sought to amend the complaint to add a party, Cryotech Management, Inc., and "to include in the complaint additional *facts* revealed during discovery." (Emphasis added.) The trial court ruled that "the plaintiff is entitled to, if it chooses to do so, attempt to bring Cryotech Management, Incorporated...into this lawsuit as an additional party defendant by appropriate amendment to the complaint that is presently before the Court." MG's motion was denied in all other respects.

On December 8, 1998, Mellon filed its second motion for summary judgment, arguing again that it was neither a partner nor a joint venturer with either Cryotech or Eastman. The trial court granted MG's motion to stay consideration of the summary judgment motion and allowed it to take additional discovery.

The trial court heard Mellon's second motion for summary judgment on October 1, 1999. On October 8, 1999, the trial court granted the motion as to the remaining claims in its entirety and certified the order as a final judgment pursuant to Tenn.R.Civ.P. 54.02. MG now appeals.

## II. *General Principles of Summary Judgment*

In deciding whether a grant of summary judgment is appropriate, courts are to determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn.R.Civ.P. 56.04. Courts "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall,* 847 S.W.2d 208, 210–11 (Tenn.1993). Thus, the questions a court must consider in determining whether to grant or deny a motion for summary judgment are (1) whether a factual dispute exists; (2) if so, whether the disputed fact is material; and (3) whether that material fact creates a genuine issue for trial. *Id.* at 214. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id.* at 215. A disputed material fact creates a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.* The phrase "genuine issue" refers exclusively to factual issues and not to legal conclusions that could be drawn from the facts. *Id.* at 211.

A party seeking summary judgment has the burden of demonstrating that there are no genuine issues of material fact and that it is entitled to a judgment as a matter of law. *Id.* at 215. Generally, a defendant seeking summary judgment may meet this burden in one of two ways: (1) by affirmatively negating an essential element of the plaintiff's case, or (2) by conclusively establishing an affirmative defense. *Id.* at 215 n. 5. "A conclusory assertion that the nonmoving party has no evidence is clearly insufficient." *Id.* at 215. Once the moving party satisfies its burden of showing that there are no genuine issues of material fact, the burden then shifts to the nonmoving party to show that there is a genuine issue of material fact requiring submission to the trier of fact. *Id.* The nonmoving party cannot simply rely upon its pleadings, but rather must set forth, by affidavit or discovery materials, specific facts showing a genuine issue of material fact for trial. Tenn.R.Civ.P. 56.06; *Byrd,* 847 S.W.2d at 215. The evidence offered by the nonmoving party must be admissible at trial but need not be in admissible form. It must be taken as true. *Byrd,* 847 S.W.2d at 215–16.

## III. *Discussion*

MG raises the following general issues on appeal: (A) whether the trial court erred in dismissing MG's negligence claim, based on the court's finding that Mellon owed no duty to MG; (B) whether the trial court erred in finding that Mellon was not involved in a joint venture or implied partnership with the other defendants; (C) whether the trial court erred in prematurely granting summary judgment as to the product claims; (D) whether the trial court erred in dismissing the products liability claim predicated on the court's finding that MG did not suffer any property damages; (E) whether the trial court erred in dismissing MG's TCPA claim, finding that there was no transaction involving a consumer product; and (F)

whether the trial court erred in denying MG's motion to amend its complaint. We will address these issues in the order stated.

### A. Negligence Claim

#### 1. General Principles of Negligence

█ To prevail on a negligence claim, a plaintiff must establish the following elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995). We are concerned with the first of these elements on this appeal.

█ To establish a duty, a plaintiff must show that there exists a "legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *Id.* A risk of harm is unreasonable "if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Id.* In making this determination, several factors must be considered, including (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; and (5) the feasibility, relative usefulness, relative safety, and relative costs and burdens of an alternative, safer course of conduct. *Id.*

█ Generally, one does not have a duty to control the conduct of another so as to prevent them from injuring a third party. *Nichols v. Atnip*, 844 S.W.2d 655, 661 (Tenn.Ct.App.1992). There are, however, exceptions to this general rule such as (1) where a special relationship exists between the one upon whom the plaintiff is attempting to impose liability and either the person whose conduct threatens to cause harm or the person who is exposed to the harm; or (2) where the person sued has control over the other's use of something that could create an unreasonable risk of harm to another. *Id; see also Godwin Aircraft, Inc. v. Walker*, C/A No. 02A01-9708-CV-00187, 1998 WL 612898, at *3 (Tenn.Ct.App.W.S., filed September 15, 1998) (finding that a lessor of an airplane owed a duty to its lessee).

MG's duty argument takes several forms. It argues that Mellon owed a duty to MG under one or more of the following theories:

(1) Mellon was the lessor of the facility;

(2) Mellon negligently entrusted the facility to Cryotech;

(3) Mellon was the "supplier," of the carbon dioxide within the meaning of the Restatement (Second) of Torts § 389;

(4) Mellon assumed a duty to supervise the operations of the facility.[6]

All of MG's negligence arguments rest on MG's assertion that the risk of harm was foreseeable.

#### 2. Duty of Lessors

MG first argues that Mellon owed it a duty of reasonable care by virtue of the fact that Mellon was the lessor of the

---

**6.** MG has broken down its duty argument into eight, rather than four, subtopics. For the sake of brevity and convenience, and because many of the issues of the subtopics are interrelated, we will address some of the subtopics along with their counterparts.

facility that produced the contaminated carbon dioxide. With respect to this argument, the crux of the disagreement between the parties lies in the characterization of the Mellon/Cryotech lease. MG argues that Mellon owes a duty to MG because the lease was a "true" commercial lease, citing several cases imposing such a duty on true lessors.[7] Mellon counters that it owes no duty to MG because it is a financing lessor rather than a true lessor.

■■■ The difference between true leases and financing leases was discussed extensively by the Pennsylvania Supreme Court in *Nath v. National Equip. Leasing Corp.*, 497 Pa. 126, 439 A.2d 633 (Pa.1981).[8] The *Nath* court said of true leases that "the lessor allows the lessee to use the equipment for some fraction of its useful life, but 'fully expects to retake the chattel at the end of the lease term and either resell or re-lease it.'" *Id.* at 635. In contrast, with financing leases, "the security lessor does not expect to retake the goods at the end of the lease period but instead to transfer full ownership to the 'lessee' for a minimal sum." *Id.*

■■■ The primary question in determining whether an agreement is a true lease or a financing lease is

> whether the lessor is, in fact, *supplying* the particular chattel or whether he is offering the use of money. In

the former instance, it is the supplier who selects the produce and places it in the stream of commerce. In the latter situation, it is the "lessee" who chooses the product he wishes to use for his purposes....

*Id.* (emphasis in original).

The Pennsylvania Supreme Court in *Nath* refused to impose § 402A strict liability upon a financing lessor, noting as follows:

> That which provides the basis for fastening liability upon suppliers of products is that the supplier or manufacturer is the one that has the control over the product and places it within the stream of commerce. The party merely financing the transaction has no control over its manufacture, is not involved in the selection of the product nor in any way makes a representation as to its quality or soundness. Between the financier and the ultimate purchaser, it is usually the latter who selects the goods, negotiates for its purchase and has control over its use.
>
> While it is true that the financing makes the purchase possible, and to that limited extent the financier can be perceived to have participated in the delivery of the product, such a tangential participation in the supply-

7. *See, e.g., Godwin Aircraft, Inc. v. Walker,* C/A No. 02A01–9708–CV–00187, 1998 WL 612898, at *2 (Tenn.Ct.App.W.S., filed September 15, 1998) (stating that "clearly, appellee owed a duty of due care when leasing appellant the airplane in question"); *Benlehr v. Shell Oil Co.,* 62 Ohio App.2d 1, 402 N.E.2d 1203, 1209 (Ohio Ct.App.1978) (holding "that where a lessor seeks to lease property for a use which is inherently dangerous or has highly dangerous potentialities involving a substantial risk to the general public, and such danger or risk to the public is such that it may be foreseen by the lessor, the lessor owes a duty of reasonable care in selecting

and entrusting such property to a lessee") (footnote omitted).

8. In *Nath,* the issue was whether § 402A of the Restatement (Second) of Torts, providing that sellers of products are strictly liable for harm to consumers caused by the sellers' products, should be extended to financing lessors. *See Nath,* 439 A.2d at 634–35. The court, having extended the application of § 402A to true lessors in a previous case, *see id.,* declined to extend its application to financing lessors. *See id.* at 636.

ing of the goods does not justify the imposition of strict liability. As noted, the financier is not supplying the chattel but rather is offering the use of money.

It would be novel indeed to suggest that financing agencies should be responsible for detecting defects in the products financed. Such a result would have catastrophic impact upon commerce. Financing institutions are not equipped to pass upon the quality of the myriad of products they are called upon to finance nor do they have direct impact upon the manufacturing process of the product to exercise quality control. Finally, their relationship with a particular manufacturer does not, in the normal course, possess the continuity of transactions that would provide a basis for indirect influence over the condition and the safety of the product.

Nor are we impressed by the fact that the security agreement may provide for the financier to gain possession of the product in the event of default. Here, again, it is obvious that the financier's control over the product is in no way related to the safety of the product but rather is contingent upon the compliance with the terms of the financing agreement.

*Id.* at 636. We agree with the approach of the Pennsylvania Supreme Court. *See* *also Scott v. Ashland Healthcare Center, Inc.*, C/A No. M1999–00346–COA–R3–CV, 2000 WL 279929, at *1 (Tenn.Ct.App.M.S., filed March 16, 2000) (affirming the trial court's grant of summary judgment in a wrongful death action to a lessor of a nursing home, even where that lessor held the license to operate the home, because the home was in fact operated by the lessee).

We now turn to the question of whether Mellon was a true lessor or a financing lessor. MG contends that Mellon is not a financing lessor (a) because Mellon hired an independent engineer to conduct performance tests of the facility prior to the closing of the lease; (b) because the terms of the lease arguably allow MG to purchase the facility at the expiration of the lease term at something other than a nominal sum; and (c) because Mellon had the contractual right to control the operation of the facility. With respect to this last assertion, MG contends that Mellon had the right to control[9] the operation of the facility because of the following, as taken verbatim from MG's brief:

> (1) Mellon hired and paid an independent engineering firm to inspect its facility;
>
> (2) Mellon continually monitored Cryotech and required Cryotech to notify Mellon of any adverse changes in the operations of its facility;

---

**9.** In its brief, MG asserts the existence of a duty because of Mellon's "right to control" the facility as a separate issue in addition to relying on the alleged right to control as a component of its argument that Mellon owed a duty to MG because it was the lessor of the facility. Along these same lines, MG argues that Mellon owed it a duty of reasonable care because Mellon was the bailor of the facility's equipment. More specifically, it argues that Mellon owed it a duty because "Mellon was engaged in a 'lucrative' bailment with Cryotech, and the object of that bailment [the facility] was defective in that it was unable to remove cyanide from the Eastman carbon dioxide." MG goes on to state in its brief that "[t]his rule is grounded in the common sense notion that the owner of a facility may wield the greatest control over its operation and would be in a superior position to correct any defects which may cause harm to persons or property." Because all of these issues center around MG's allegation that Mellon had a "right of control" over the facility, we address them all together at this stage of the discussion.

(3) Mellon required Cryotech to comply with all government laws and regulations, and Mellon has put forth no proof that Cryotech was in compliance with food and drug laws;

(4) Mellon had the contractual right to take control of its facility, to run the facility, or sell the facility once Cryotech defaulted under the lease;

(5) Cryotech was in default for various reasons under the lease, including its refusal to provide audited financial statements, its default under the feed-gas agreement, and its failure to operate the facility in compliance with "all governmental laws" and to "maintain the Facility in good repair, condition and working order...";

(6) Mellon retained the right to inspect the Mellon Facility and Cryotech's books. Mellon specifically retained the right to inspect the Facility with its independent engineer; and

(7) Tom Dunlap of Cryotech recognized that Mellon wielded control over the production of [carbon dioxide] as did Katherine Fulton of Mellon.

This argument concludes with the assertion that Mellon's failure to engage in alternative conduct by warning MG or its customers of the risk of cyanide contamination or by enforcing its rights under the agreements it had with Cryotech and Eastman constituted a breach of duty that Mellon owed to MG.

We find and hold that the trial court did not err in finding that these circumstances do not, directly or inferentially, make out a genuine issue of material fact. The above-mentioned facts upon which MG relies to establish that Mellon had control over the facility merely indicate that Mellon had taken steps to protect its security interest in the facility and equipment. These measures are not uncommon devices utilized in a financing scheme to secure repayment.

The fact that Mellon had a *right* to control the operations does not mean that it in fact exercised control. Significantly, we find no evidence in the record before us even remotely suggesting that Mellon exercised any control over the day-to-day operations of the Cryotech facility. For these reasons, we find and hold that Mellon owed no duty to MG merely by virtue of being a "lessor" of the facility.

MG also argues that, regardless of whether Mellon is a true lessor or merely a financing lessor, Mellon owes a duty to MG under a negligent leasing/failure to supervise theory. To support this argument, MG brings to our attention the case of *Kraemer v. General Motors Acceptance Corp.*, 572 So.2d 1363 (Fla.1990).

In *Kraemer,* the Florida Supreme Court held a long-term lessor of an automobile liable for injuries incurred when an unauthorized driver of the leased automobile collided with the decedent's vehicle. *See id.* at 1364, 1367. MG relies on this case to support its argument that Mellon owed MG a duty. *Kraemer,* however, was decided under Florida's dangerous instrumentality doctrine, which provides that

> one who authorizes and permits an instrumentality that is peculiarly dangerous in its operation to be used by another on the public highway, is liable in damages for injuries to third persons caused by the negligent operation of such instrumentality on the highway by one so authorized by the owner.

*Id.* at 1364–65. Thus, the *Kraemer* case deals with the leasing of an automobile which Florida has held to be a dangerous instrumentality. That holding does not relate to the facts of the instant case.

 We recognize that, in Tennessee, one who conducts an inherently dangerous activity has a non-delegable duty to

"exercise caution adequate to the peril involved, as for example, in giving notice of its dangerous character." *International Harvester Co. v. Sartain*, 32 Tenn.App. 425, 454, 222 S.W.2d 854, 867 (1948). But we do not believe that the manufacture of liquid carbon dioxide for use in soft drinks and for other uses is an inherently dangerous activity. *Cf. Graham v. Cloar*, 30 Tenn.App. 306, 308, 316, 205 S.W.2d 764, 766, 769 (1947) (finding that "the use of carbonic acid gas in bottled drinks for effervescing effects" is not a use of a dangerous substance or instrumentality even though the gas caused some bottles to break, injuring the plaintiff's eye). Nor is Mellon, as we have already discussed, the one conducting the activity here; it is merely a secured creditor which has reserved unto itself some rights in order to secure its financial interest in the facility. Therefore, we find no error in the trial court's judgment with respect to the theory that Mellon owed a duty by virtue of it "leasing" the facility to Cryotech.

### 3. Negligent Entrustment

 MG contends that Mellon owed it a duty to use reasonable care under a negligent entrustment theory. To prevail on a negligent entrustment claim, a plaintiff must establish the following: "(1) an entrustment of a chattel, (2) to a person incompetent to use it, (3) with knowledge that the person is incompetent, and (4) that is the proximate cause of injury or damage to another." *Nichols v. Atnip*, 844 S.W.2d 655, 659 (Tenn.Ct.App.1992).

 MG contends that Mellon entrusted its facility to Cryotech, which it knew was not financially strong enough to withstand the contamination problems that it ultimately experienced. For the same reasons as discussed immediately above, we find that this doctrine does not apply because Mellon is a secured party rather than a true lessor, and, as such, did not entrust "its" facility to Cryotech. We also find no proof in the record to indicate the "incompeten[cy]" contemplated by the above-stated rule.

MG asserts that Mellon can still be held liable for negligent entrustment, even as a secured party, under the reasoning of *Peterson v. Halsted*, 829 P.2d 373 (Colo.1992). In that case, the Colorado Supreme Court described negligent entrustment as a shortcut to establishing the duty and breach elements of negligence. *Id.* at 378. In determining whether to utilize this shortcut or whether to apply the traditional negligence analysis, the court found "that the circumstances in which money or credit may be lent…are so many and varied as not to be readily adaptable to the simplified resolution of the duty question that results from the application of negligent entrustment analysis." *Id.* The court listed three factors it considered particularly relevant to the question of whether to utilize the negligent entrustment analysis in place of the traditional duty and breach elements of a negligence claim: (1) the lender/borrower relationship; (2) the circumstances relating to the borrower's finances; and (3) the time elapsed between the loan and the injury. *See id.* The court then declined to use the negligent entrustment analysis in determining whether the parents of a 25-year-old intoxicated driver breached a duty to the plaintiff by co-signing the documents which enabled the driver to obtain the vehicle. *See id.* at 378, 376.

 We agree with the Colorado Supreme Court that negligent entrustment should not be used as a shortcut to establish the duty and breach elements of a negligence action in every instance where the defendant, by loaning funds, enables another to obtain the instrument of a tort. Rather, we believe the question depends

on the circumstances, and, under the circumstances of this case, we are of the opinion that a traditional framework of a negligence analysis should be utilized instead. Under such a framework, as we have already discussed, Mellon owed no duty to MG.

### 4. Restatement (Second) of Torts § 389

■ MG next argues that Mellon owed it a duty of reasonable care under the Restatement (Second) of Torts § 389, which provides as follows:

> One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put, is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.

Comment c to this section states in part that

> the circumstances may be such that although the chattel is capable of being made safe for use, the person supplying it should realize the unlikelihood that this will be done before it is used. Among circumstances which render this unlikely are the facts that...the person to whom it is supplied is financially incapable of bearing the expense of making it safe....

■ We find that Mellon owed no duty to MG under this section of the Restatement because Mellon is not a "supplier" within the meaning of the rule. While Mellon has supplied the *funds* which have enabled Cryotech to operate the facility, it did not supply MG with the contaminated carbon dioxide. We find this issue adverse to MG.

### 5. Assumption of Duty to Supervise

Finally, MG argues that Mellon owed it a duty to use reasonable care because it assumed a duty to supervise the operations of the facility. In support of this argument, MG relies on the Restatement (Second) of Torts § 324A, which provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

■ It is not entirely clear whether Tennessee has adopted this section of the Restatement. *See Gaines v. Excel Industries, Inc.,* 667 F.Supp. 569, 571 (M.D.Tenn.1987) (stating that no Tennessee court has expressly adopted the section but holding that "faced with a situation similar to this case, a Tennessee court would apply the Restatement formulation."). In any event, it is clear that one who assumes to act assumes a duty to act with reasonable care. *See Marr v. Mont-*

*gomery Elevator Co.,* 922 S.W.2d 526, 529 (Tenn.Ct.App.1995).

As discussed previously, Mellon had certain contractual rights to monitor and control the facility's operations. To the extent, if any, it exercised these rights, it did so for the purpose of protecting its financial interest in the facility. It did not assume a duty to purify the carbon dioxide, but rather asserted its right to demand that Cryotech live up to its contractual obligations.

In summary, we find and hold that Mellon has carried its summary judgment burden to establish that there is no genuine issue of material fact and that MG has failed to carry its burden to establish the existence of such a genuine issue of material fact. Accordingly, with respect to MG's negligence claim against Mellon, we hold that the trial court did not err in granting summary judgment to Mellon on the ground that it owed no duty to MG.

### B. Joint Venture/Implied Partnership Claim

MG's second major argument is that the trial court erred in finding that no joint venture or implied partnership existed with respect to Mellon, Cryotech, and Eastman. More specifically, MG argues that a joint venture or implied partnership existed because the defendants (1) had a common business purpose; (2) combined their various resources, skill, and funds; (3) intended to profit from the relationship; and (4) all had an equal right to control the joint venture or implied partnership. Mellon counters that its actions relating to the other parties were nothing more than the ordinary actions of a prudent, secured lessor.

A partnership is defined in T.C.A. § 61–1–105(a) (Supp.1999) as "an association of two (2) or more persons to carry on as coowners a business for profit...." A partnership can only be created pursuant to a contract of partnership, though such an agreement may be either express or implied. *Bass v. Bass,* 814 S.W.2d 38, 41 (Tenn.1991). To determine whether a partnership exists, courts must ascertain the intention of the parties. *Id.* In the absence of a written agreement, the requisite intention is that which is deducible from the parties' actions. *Wyatt v. Brown,* 39 Tenn.App. 28, 33, 281 S.W.2d 64, 67 (1955). The parties need only intend "to do the things which constitute a partnership." *Bass,* 814 S.W.2d at 41. A partnership results if the parties "place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them." *Id.* It is not necessary that the parties intend to actually form a partnership or even that they know the legal result of their actions is to create a partnership. *Id.* Accordingly, the terminology used by the parties to describe their business relationship is of little import. *Id.*

The determination of whether a partnership exists must be made "upon consideration of all relevant facts, actions, and conduct of the parties," *id.,* and the burden of proof rests on the party seeking to establish the existence of a partnership. *Mullins v. Evans,* 43 Tenn.App. 330, 338, 308 S.W.2d 494, 498(1957). "Generally, what will constitute a partnership is a matter of law, but whether a partnership exists under conflicting evidence is one of fact." *Wyatt,* 281 S.W.2d at 68.

A joint venture is similar, but not identical, to a partnership, and has been described by our Supreme Court as "something like a partnership, for a more limited period of time, and a more limited purpose." *Fain v. O'Connell,* 909 S.W.2d 790, 792 (Tenn.1995). Joint ventures are governed by the same rules of law as those

governing partnerships. *Federated Stores Realty, Inc. v. Huddleston,* 852 S.W.2d 206, 212 (Tenn.1992).

In support of its argument that the defendants were involved in a joint venture or implied partnership, MG asserts that the following facts, as quoted verbatim from its brief, establish a genuine issue of material fact requiring submission to a jury:

(1) Under the Cryotech/Eastman payment scheme, any additional profits which Cryotech earns by charging its customers more for the liquid carbon dioxide directly benefits Eastman through a corresponding increase in profits....

(2) Mellon derived substantial tax benefits, as well as lease payments from revenues received from Cryotech's sale of [carbon dioxide] in the amount of $3,087,895.00.

(3) Mellon participated in negotiating Eastman's attempts to obtain a right of first refusal to purchase the Mellon Facility in the event Cryotech defaulted.

(4) Mellon received the value of any and all improvements made by Cryotech to the facility.

(5) Both Eastman and Mellon had the right to audit Cryotech's books.

(6) Neither Mellon nor Eastman chose to enforce their rights granted under the various agreements, including Eastman's right of payment for the feedgas at issue and Mellon's right to foreclose on its agreement with Cryotech....

(7) Despite Mellon's knowledge that Cryotech was thinly capitalized to the extent that it could not make necessary improvements to the facility, Mellon continued to forgive Cryotech

of its breach of various lease requirements.

(8) Mellon not only approved the contracts between Cryotech and its customers, it took an active role in assuring by way of an independent engineer that the plant was properly constructed.

(9) [Cryotech's president] testified that Mellon's consent was required for Eastman or Cryotech to amend the Feedgas Agreement and that the continuous impurity problem in the feedgas constituted an informal amendment of the Feedgas Agreement.

(10) [Cryotech's president] further testified that the parties' obligations extended "outside the four corners of the contract[;] we each had an obligation to the other parties."

(11) Correspondence between Mellon and Cryotech contains the following statement: "We again want this to serve as a reminder that each of the three parties involved here did agree to assume an obligation to the other two parties."

(12) Eastman was a long-standing customer of Mellon, which is likely a primary reason why Mellon refused to exert its right to control in the instant case once it learned of the cyanide-laden carbon dioxide....

(13) ... Mellon had the right to control the production of [carbon dioxide] and the enterprise itself.

In support of its argument that Mellon was involved in a joint venture or implied partnership with the other defendants, MG calls our attention to the case of *Memphis Natural Gas Co. v. Pope,* 178 Tenn. 580, 161 S.W.2d 211 (1941), a case in which the Supreme Court found that two entities were jointly associated for the purpose of state excise taxes. More on point, and, we think, more persuasive, is *Liona Corp. v.*

*PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585 (2d Cir.1991). This case concerns the proper characterization of the relationship between the parties to a sale and leaseback transaction. *See id.* at 589–590. A corporation referred to as Liona financed PCH's acquisition and renovation of a hotel. *See id.* at 590. PCH conveyed the land upon which the hotel was situated to Liona and in return Liona provided the acquisition funds. *See id.* Liona then leased the land back to PCH. *See id.* The hotel was sold at public auction after PCH filed for bankruptcy, *see id.* at 590, 591, and the primary question of the case was whether Liona was a secured creditor or a joint venturer with PCH. *See id.* at 592. The court held that Liona was a secured creditor, finding that

> the alleged "control rights" that Liona imposed on PCH were unremarkable security preserving measures. In reaching the contrary conclusion, Bankruptcy Judge Lifland focused on the following "control rights": (1) PCH was required to adopt certain accounting procedures and Liona was to have periodic access to PCH's books and records, (2) the parties were to cooperate in the disposition of any insurance proceeds, (3) in the event that restoration or capital improvement costs were to exceed $500,000, Liona retained the right to exercise reasonable veto power over the selection of an architect, engineer, or general contractor, (4) PCH had to obtain Liona's consent before it could dispose of its interest in the Hotel and Liona had a right of first refusal, and (5) Liona had the right to step in and to perform any acts that PCH was obligated but failed to perform, including any mortgagee's obligations.
>
> None of these factors, viewed independently or collectively, is inconsistent with a secured financing transac-

tion.... All the conditions that the bankruptcy court focused on merely afforded Liona the right to take steps to protect the value of its security interest—the value of the land was inextricably linked to the success and value of the Hotel. Indeed, it is not uncommon for secured creditors to reserve the right to step in to perform obligations that are ordinarily the debtor's responsibility—payment of insurance premiums, payment of taxes, payment of construction workers to ensure that the property is not encumbered by mechanics' liens or approval of any major changes in the physical characteristics of the secured property....

> ...[P]erhaps most important, none of these alleged "control rights" demonstrate that Liona retained the right to control the operations or management of the Hotel.... The "control rights" outlined above suggest only that Liona...negotiated a favorable transaction that would insulate [it] from the risk of loss.

*Id.* at 602 (citation omitted).

We find the reasoning and result of *PCH* persuasive. The facts relied upon by MG to show that a genuine issue of material fact exists as to whether a joint venture or implied partnership exists are nothing more than "unremarkable security preserving measures." *Id.* They merely afford Mellon the rights necessary to protect its security interest in the facility. The fact that each of the defendants expected to profit from the relationships does not mean that they expected to share the profits of Cryotech's business. The fact that Cryotech's profits and Eastman's profits seem to be somehow linked to one another does not establish anything with respect to Mellon. The fact that the parties considered themselves obligated to each other

may establish that they had some contractual agreement, but it does not establish that there was an agreement to act as partners or joint venturers. For the foregoing reasons, we find and hold that Mellon has carried its summary judgment burden and that MG has failed to establish the existence of a genuine issue of material fact. Consequently, we find no error with respect to the trial court's determination that Mellon was not involved in a joint venture or implied partnership with the other defendants. While many facts were developed by MG during extensive discovery, those facts simply do not show, directly or inferentially, that Mellon was involved in a partnership or joint venture with the other defendants.

## C. Timing of Summary Judgment Grant

MG next argues that the trial court erred in prematurely granting summary judgment as to the product claims. A repetition of the facts pertinent to this argument is necessary.

MG filed its first suit against Mellon and the other defendants in 1997.[10] On June 13, 1997, Mellon filed a motion for judgment on the pleadings and a motion for protective order requesting that discovery be stayed until after the court ruled on the motion for judgment on the pleadings. On July 28, 1997, the trial court denied the motion for judgment on the pleadings and gave Mellon until August 17, 1997, to answer the complaint and until September 16, 1997, to respond to MG's written discovery requests.

On January 19, 1998, Mellon filed its first motion for summary judgment. At the March 20, 1998, hearing on the motion, the trial court denied Mellon's motion for summary judgment so that MG could take additional discovery. On April 22, 1998,

the trial court granted Mellon's motion for summary judgment as to the product claims.

"[S]ummary judgment is not a disfavored procedural shortcut but rather an important vehicle for concluding cases that can and should be resolved on legal issues alone." *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn.1993). It is a vehicle that allows courts "to determine whether the case justifies the time and expense of a trial." *Id.* at 210.

Implicit in the summary judgment rubric is the idea that it should only be granted after adequate time for discovery. *See id.* at 213 ("In our view, the plain language of Rule 56(c) [the federal equivalent of Tenn.R.Civ.P. 56.04] mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (emphasis added)).

We are of the opinion that MG had ample time to develop its case against Mellon. The suit was first filed in February, 1997, the federal suit being filed several months earlier. It is true that from June 13, 1997, until July 28, 1997, MG was prohibited by court order from conducting discovery and that Mellon was not obligated until August, 1997, and September, 1997, respectively, to answer MG's complaint and to respond to MG's written discovery requests. Still, MG had from the latter date until the March 20, 1998, hearing to develop its case. Even then, the court gave MG another month to engage in

---

**10.** The federal suit was filed even earlier, in June, 1996.

discovery before granting summary judgment as to the product claims. Thus, MG had approximately 15 months, eleven in which to conduct discovery in order to develop its case against Mellon. It appears from the briefs that MG took some 40 depositions and had the benefit of access to over 34,000 pages of documents. We therefore find and hold that the trial court did not prematurely grant summary judgment for Mellon as to the product claims.

### D. Products Liability Claim

MG next argues that the trial court erred in dismissing its products liability claim against Mellon based on its finding that MG did not incur property damage. MG contends that its customers suffered damage to property and that it is entitled, under the theories of subrogation and/or contribution, to recover for the property damages that its customers incurred.[11]

 Subrogation is "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." *Castleman Constr. Co. v. Pennington,* 222 Tenn. 82, 93, 432 S.W.2d 669, 674 (1968). The right of subrogation "is founded upon equity and justice and accrues when one person for the protection of his own interests, pays a debt for which another is primarily liable." *Amos v. Central Coal Co.,* 38 Tenn. App. 626, 638, 277 S.W.2d 457, 462 (1954). The right of contribution exists where two or more persons are liable in tort for the same wrong. *See* T.C.A. § 29–11–102 (2000).

MG's argument that it is entitled under the theories of subrogation and/or contribution, to recover the funds it expended in settlement of its customers claims from Mellon and the other defendants presupposes that Mellon is, along with the other defendants, liable. We have already found that Mellon owed no duty to MG or its customers. Therefore, MG can have no right to subrogation or contribution with respect to Mellon.[12] This argument is without merit.

### E. Claim Under the TCPA

MG next argues that the trial court erred in dismissing its claim brought under the Tennessee Consumer Protection Act.

The Tennessee Consumer Protection Act of 1977 ("the Act") is codified at T.C.A. § 47–18–101 *et seq.* One of the goals of the Act is "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." T.C.A. § 47–18–102(2) (1995).

T.C.A. § 47–18–104(b) (Supp.2000) lists certain "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce" that are considered to be in violation of the Act. T.C.A. § 47–18–103(11) (Supp.2000) defines the terms "trade," "commerce," or "consumer transaction" to mean "the advertising, offering for sale, lease or rental, or distribution of

---

**11.** MG also argues that the trial court erred in dismissing the breach of contract and breach of warranty claims based on its finding that MG was not in privity with Mellon. It argues that MG was in privity with Mellon by virtue of the joint venture/implied partnership that allegedly existed between Mellon, Cryotech, and Eastman. As we have already held that no such joint venture or implied partnership existed, we do not find it necessary to further address this argument.

**12.** We withhold judgment as to whether MG may have a right to subrogation or contribution with respect to the other defendants as that question is not before us.

any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated."

Among the list of prohibited acts or practices found in T.C.A. § 47–18–104(b) is "[r]epresenting that goods or services are of a particular standard, quality or grade...." T.C.A. § 47–18–104(b)(7) (Supp.2000). "Goods" refers to "any tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes or a franchise, distributorship agreement, or similar business opportunity." T.C.A. § 47–18–103(5) (Supp.2000).

> Under T.C.A. § 47–18–109(a)(1) (1995), [a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

A corporation is a "person" as that term is defined in T.C.A. § 47–18–103(9) (Supp. 2000), and thus, a corporation may bring an action under the Act. *See ATS Southeast, Inc. v. Carrier Corp.*, 18 S.W.3d 626, 626 (Tenn.2000) (finding that "a corporation has standing to bring a private cause of action for treble damages under Tenn. Code Ann. § 47–18–109(a).").

■■■ MG argues that its claim under the Act is viable because Mellon, by representing that the carbon dioxide was of a particular standard, quality or grade, has engaged in an unfair or deceptive act causing injury to MG. It also argues that Mellon's sale of "its" carbon dioxide was an offering for sale or distribution of a good falling within the meaning of "consumer transaction" found in the Act.

We find that the trial court did not err in concluding, with respect to MG's claim under the Act, that there was no genuine issue of material fact and that Mellon is entitled to a judgment as a matter of law. MG has not made out a TCPA claim against Mellon. We find no facts suggesting that Mellon has represented to MG that the carbon dioxide was of a certain standard, quality, or grade. We also find that, because Mellon is merely a financing lessor, it did not offer the carbon dioxide for sale or distribution. Therefore, we find this issue adverse to MG.

### F. Motion to Amend

Finally, MG argues that the trial court erred in denying MG's second motion to amend its complaint.

■■■■ Complaints must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Tenn.R.Civ.P. 8.01. Generally, a party may amend its complaint with leave of the court, and such leave is to be freely given. *See* Tenn.R.Civ.P. 15.01. In determining whether to grant a motion to amend, courts are to consider the following factors: "undue delay in filing; lack of notice to the opposing party; bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Welch v. Thuan,* 882 S.W.2d 792, 793 (Tenn.Ct.App.1994). The question of whether to grant a motion to amend "is within the sound discretion of the trial court, and will not be reversed unless abuse of discretion has been shown." *Id.*

■■■ MG's first complaint was filed on February 4, 1997. An amended complaint was filed on October 24, 1997. On October 15, 1998, MG filed a motion to amend seeking permission to file a second amend-

ed complaint. This motion sought to amend the complaint to add a party, Cryotech Management, Inc., and, according to MG, "to include in the complaint additional *facts* revealed during discovery." (Emphasis added.) The trial court ruled that "the plaintiff is entitled to, if it chooses to do so, attempt to bring the Cryotech Management, Incorporated...into this lawsuit as an additional party defendant by appropriate amendment to the complaint that is presently before the Court." The motion was otherwise denied.

MG argues that its proposed second amended complaint should have been allowed because it simply adds a new party and supplements the first amended complaint with additional factual evidence revealed during discovery. It claims that it sought to amend its complaint at this time because it was faced with four potentially dispositive motions contending failure to state a claim or insufficient facts. In contrast, Mellon argues that the proposed amendment violates both the rule and spirit of Tenn.R.Civ.P. 8 in that it is overly long and includes many new factual assertions.

We have reviewed the first amended complaint and the proposed amended complaint, and we find and hold that the trial court did not abuse its discretion in disallowing, to the extent it did, MG's motion to amend. The proposed amended complaint is 28 pages in length. Paragraph seven alone spans three full pages. There is nothing about the proposed second amended complaint to indicate that, even if allowed, it would change the correctness of the trial court's conclusion that Mellon was entitled to summary judgment. Accordingly, we cannot say that the trial court abused its discretion in denying the subject amendments.

### IV. *Conclusion*

In conclusion, we find that there were no facts before the trial court which, individually or collectively, indicate, directly or inferentially, that Mellon is liable to MG under any of the theories advanced by MG in this case. The judgment of the trial court is found by us to be correct and is, accordingly, affirmed. This case is remanded for collection of costs assessed below, pursuant to applicable law. Costs on appeal are taxed to the appellant.